THE STATE ex rel. JAMES D. ROLAND v. JOHN DREYER, Mayor, et al.

In Banc, June 21, 1910.

1. **MANDAMUS: Threatened Action.** Mandamus cannot be used to prevent unauthorized threatened action. Injunction alone is the remedy in such case. So that an original writ of mandamus, issued out of the Supreme Court, against the mayor and council of a city, to cancel and revoke the license and franchise granted by certain ordinances to a railroad company, to build and operate its tracks upon a public levee of the city, and to require the company to immediately cease operations under said franchise and to remove all obstructions now placed or being placed on said public levee by virtue of said ordinances, cannot be maintained, and the writ must be quashed, where the fact is that at the time the proceeding was instituted the railroad company had not in any manner obstructed the public landing or laid or commenced laying its tracks upon said levee.

2. ———: ———: **Injunction: Entertained Nevertheless.** The Supreme Court has no power under the Constitution to issue an injunction to prevent a threatened wrong; and that being the case, and while mandamus is not the remedy, and the alternative writ must be quashed, yet where all the interested parties are before the court, and the rights of all have been pleaded, argued and briefed, and a dismissal would be a most unsatisfactory adjustment of the vital issues involved, the real merits of the case will be determined.
   *Held*, by LAMM, J., dissenting, that the court has no jurisdiction, and all it says on the merits is *obiter*.

3. **PUBLIC USE: Levee: Diversion to Another Public Use.** A public landing is a place on a river or other navigable water for loading or unloading goods, or for the reception and discharge of passengers; and a definite, specific and limited grant

State ex rel. v. Dreyer.

to a city of such a landing cannot be diverted to a different and inconsistent use. The General Assembly cannot destroy a trust or divert it to a purpose inconsistent with the particular use to which it was dedicated. The General Assembly may directly, or by a grant to a city indirectly, regulate the use or promote the improvement of a public levee or landing place, dedicated to the public, but it cannot destroy it or divert or subject it to a use inconsistent with the purpose of the dedication.

4. ————: ————: Constructing Railroad Tracks Thereon. The owner of land along the Mississippi river in 1836 platted it, and on the plat marked and designated a certain part as a "public levee" and a "public landing," and the plat was recorded, and thereafter that part was used and is still used as a public landing for steamboats, and the city granted to the railroad company the right to construct a double-track railroad through the center and the full length thereof, and spur tracks, but required it to grade and pave the levee a distance of 750 feet, and to extend the streets and to provide safe, well- constructed and convenient crossings over the track, and to reconstruct the boathouse so as to afford enlarged facilities for the landing of boats, and if the improvements are carried out the city for the first time will have a properly improved levee adapted to river traffic, and boats may conveniently and safely anchor at any time, at either low or high water, whereas heretofore they could land only at low water. The railroad company has no other connection with the union depot, and owing to the topography can have no other except over 'this levee. It is not permitted to use the tracks for car yards, or for switching, but only for passage, and its use of the levee and the rights of the public are safeguarded. The only objection to the railroad use is that it will increase the danger to life and limb of those using the river traffic. *Held*, that the railroad use of the levee is and must ever be subsidiary and subservient to the use of the levee for river traffic, but it is not an inconsistent use, nor a diversion of the trust, and the ordinances were not void or voidable.

*Held*, by LAMM, J., dissenting, that the municipal scheme evidenced by the ordinances sells to a railroad company a right to use a levee dedicated to public use for river traffic, and that railroad use is inherently antagonistic to river traffic, and the ordinances should be held void.

## Mandamus.

WRIT DENIED.

*Thos. F. Gatts* for relator.

The effect of the Glascock plat and the effect of the dedications of the public ground dedicated by him upon the plat, have been before the Supreme Court in two separate cases, and in both of these cases the court upheld and sustained the effect and purposes of these dedications. Hannibal v. Draper, 15 Mo. 635; Hannibal v. Draper, 36 Mo. 332. The following line of decisions in this State, upholds the long established doctrine of the law as to the effect of such dedications. Rutherford v. Taylor, 38 Mo. 315; Hannibal v. Draper, 15 Mo. 635; Brown v. Manning, 6 Ohio 129; Pawlet v. Clark, 9 Cranch 292; Cincinnati v. White, 6 Pet. 432; Lane v. Shepherd, 2 Strange 1204; Jarvis v. Dean, 3 Bing. 447; New Orleans v. U. S., 10 Pet. 662; California v. Howard, 78 Mo. 89; Price v. Thompson, 48 Mo. 363; Sugar Refining Co. v. Elevator Co., 82 Mo. 121; Barclay v. Howells, 6 Pet. 498; Cummings v. St. Louis, 90 Mo. 259; Board of Regents v. Painter, 102 Mo. 465; Warren v. Mayor, 22 Ia. 351; Trustees v. Hoboken, 33 N. J. L. 16; Tracy v. Bittle, 213 Mo. 302; State ex rel. v. Railroad, 206 Mo. 258; Goode v. St. Louis, 113 Mo. 257. One straight, unbroken line of decisions in the Supreme Court holds to the unqualified position, "That specific property dedicated by the owner for designated specific and limited uses, to the public, cannot be diverted in such use inconsistent with and not connected with the purposes of such dedication." Practically, this is the uniform doctrine enunciated by the Supreme Court of the United States and the Federal courts as well as the appellate courts of every State in the Union. Railroad v. Schurmeir, 74 U. S. 272; New Orleans v. U. S., 10 Pet. (U. S.) 662; U. S. v. Railroad, 154 U. S. 225; Hoadley v. San Francisco, 124 U. S. 639; Barclay v. Howell's Lessee, 31 U. S. (6 Pet.) 498; Railroad v. Cincinnati, 76 Ohio St.

481; Railroad v. People, 222 Ill. 427; Alton v. Ill.
Transp. Co., 12 Ill. 38; Covington v. McNickle, 57 Ky.
(18 B. Mon.) 262; McAlpine v. Railroad, 68 Kas. 207;
Coffin v. Portland, 27 Fed. 416; Parker v. St. Paul, 47
Minn. 317. There may be an express dedication of
lands along the margin of navigable water for use as
a landing wharf, dock, or levee. New Orleans v. U. S.,
10 Pet. (U. S.) 662; Railroad v. Schurmeir, 7 Wall. (U.
S.) 272; Barney v. Baltimore, 1 Hughes (U. S.) 118;
Coffin v. Portland, 27 Fed. 412; Demoplis v. Webb, 87
Ala. 659; Napa v. Howland, 87 Cal. 84; Godfrey v. Al-
ton, 12 Ill. 476; Railroad v. People, 222 Ill. 427;
Freedom v. Norris, 128 Ind. 377; Newport v. Taylor,
16 B. Mon. (Ky.) 699; Municipality v. Kirk, 5 La.
Ann. 34; Coolidge v. Learned, 8 Pick. (Mass.) 504;
Buschmann v. St. Louis, 121 Mo. 523; Buffalo v. Rail-
road, 39 N. Y. Supp. 4; Askew v. Wynne, 7 Jones L.
(52 N. C.) 22; Railroad v. Portland, 14 Ore. 188;
Parish v. Stephens, 1 Ore. 59; Penny Pot Landing, 16
Pa. St. 79; Gardner v. Tisdale, 2 Wis. 153; Lawe v.
Kaukauna, 70 Wis. 306. Although the fee of land
dedicated to public uses may be vested in the county,
or in the owners of abutting lots, yet the officers of an
incorporated city have the possession and control of
all such land within the city limits, and may regulate
the use of the same, but they may not devote said land
to private uses or even to public uses different from
those intended by the dedicator. School District v.
Painter, 102 Mo. 664; Hurd v. Harvey County, 40 Kas.
92; Dubuque v. Maloney, 9 Ia. 450; Hoadley v. San
Francisco, 50 Cal. 265; Lamar County v. Clements, 49
Tex. 347; Alves v. Henderson, 16 B. Mon. (Ky.) 168;
Covington v. McNickle, 18 B. Mon. (Ky.) 284; Flem-
ingsburg v. Wilson, 1 Bush (Ky.) 204; Portland v.
Whittle, 3 Ore. 126; U. S. v. Railroad, 2 Biss. (U. S.)
174; Cook v. Burlington, 30 Ia. 94; Warren v. Lyons
City, 22 Ia. 351; Field v. Barling, 149 Ill. 556; Lee v.

Mound Station, 118 Ill. 318; Morgan v. Railroad, 96 U. S. 716; Ruch v. Rock Island, 97 U. S. 693. Such property as is held in trust for the public as streets, alleys, public squares, wharves, etc., can no more be disposed of by the corporation in violation of the trust than trust property held by an individual. Railroad v. Elevator Co., 2 Dill. (U. S.) 70; San Francisco v. Itsell, 80 Cal. 57; Oakland v. Water Front Co., 118 Cal. 160; Ft. Wayne v. Railroad, 132 Ind. 558; Giltner v. Carrolton, 7 B. Mon. (Ky.) 680; Commonwealth v. Ruch, 14 Pa. St. 186; Weekes v. Galveston, 21 Tex. Civ. App. 102; Ogden v. Bear Lake Co., 16 Utah 440. It is now the settled law of this State that a private citizen may be a party to a proceeding to compel proper observance by the officers of the city or a railroad company in a matter of public right. State ex rel. v. Railroad, 86 Mo. 13; High, Ex. L. Rem., secs. 431-34, p. 304; People v. Collins, 19 Wend. 56; School Directors v. People, 123 Ill. App. 73; State ex rel. v. Railroad, 206 Mo. 251; Tracy v. Bittle, 213 Mo. 302; Railroad v. Hall, 91 U. S. 343.

*Berryman Henwood, Robert & Robert, Geo. A. Mahan, Albert R. Smith* and *O. M. Spencer* for respondents.

(1) A railroad company has the power to construct and operate a railroad between any points in this State. Constitution of Mo., sec. 13, art. 12; R. S. 1899, secs. 1122 and 1135. Under this power respondent has the right to condemn a right of way through the public landing. Railroad v. Coal Co., 161 Mo. 288; Kansas City v. Oil Co., 140 Mo. 458; Railroad v. Depot Co., 125 Mo. 82; 1 Farnham, Waters, 552 and note. And this even though the use of the railroad company might be deemed an entirely inconsistent use of the public landing. Augusta v. Railroad, 98 Ga. 161; Railroad v. Starkweather, 97 Ia.

159; Railroad v. Portland, 140 Ore. 198. In the absence of statutory provision, expressed or by implication, permitting it, property devoted to one public use may, under general statutory authority, be taken for another public use, when it will not materially impair or interfere with an already existing use and is not detrimental to the public. Railroad v. Tel. Co., 120 Ala. 21; Steel v. Epson, 142 Ind. 397; Boston v. Brooklyn, 156 Mass. 172; Telephone Co. v. Railroad, 76 Minn. 334; In re Rochester Water Commissioner, 66 N. Y. 413. It is not material that some inconvenience may result to the prior occupant if the conditions are such that the two uses can stand together. Augusta v. Railroad, 98 Ga. 161; Salt Lake City v. Water Co., 24 Utah 249; Telephone Co. v. Railroad, 23 Utah 474. The rule that power must be conferred expressly or by necessary implication applies only where the second use will destroy or injure the use to which the land was originally appropriated or dedicated. Railroad v. Jackson, 156 Ind. 260; Gold v. Railroad, 153 Ind. 230; Railroad v. Anderson, 139 Ind. 490; Matter of Folt's Estate, 18 N. Y. App. Div. 568. The city will be greatly benefited by the improvement of the levee, and greatly injured if the Burlington Railroad is not permitted to make its north and south and east and west connections across the levee, as contemplated in the ordinance. There is a public necessity for the completion of the work as contemplated by the ordinances. If prevented, the railroad company could condemn and the city fail to get an improved landing. It is not contended that the city could change the use of this property by destroying the landing. It could not make a park out of the public landing, nor turn it into a railroad switchyard. It could not lay it off into lots and blocks and build permanent structures thereon; but it has the power to do anything that will not materially impair its use as a public landing. And

especially can it do anything to facilitate the handling
of freight and passengers on and across the landing.
(2)   It never has been held by any court that railroad
tracks across a public landing are inconsistent with
its use and cannot legally be laid.   Courts, whenever
the question has been before them, have universally
allowed the building of the tracks across a public land-
ing.   The finding of the commissioner is the first ex-
ception thereto.   St. Paul v. Railroad, 63 N. W. 267;
65 N. W. 649; 68 N. W. 458; Railroad v. Portland, 14
Ore. 188; Belcher Co. v. Elevator Co., 101 Mo. 192.
(3)   The general power of eminent domain possessed
by railroad companies, and the statutory right of
cities owning property to contract for right of way, are
sufficient to give the city of Hannibal the power to
enact the ordinance in question, without specific char-
ter authority to grant right of way across the landing,
as in the case of streets and alleys.   Practically, the
public landing is a street; Broadway or Market street,
Center street, Bird street and Hill street run into it,
and people living on such streets go to the river over
the public landing, either walking or in any kind of
vehicle they see proper, from a dray to an automobile.
Stephen Glascock himself regarded it practically as a
street.   He dedicated to the blocks for a public land-
ing and then put First street on the land so dedicated.
In fact, public landings and streets are so closely con-
nected as to be considered one and the same.   They
are convertible terms.   In the charter of the city,
streets and alleys and public landings are classed to-
gether.   Cincinnati v. White, 6 Pet. 435; Bartley v.
Howell, 6 Pet. 498; New Orleans v. U. S., 10 Pet. 662;
Power v. Portland, 5 B. Mon. 232; Godfrey v. Alton, 12
Ill. 29; Gardner v. Tisdale, 2 Wis. 153; Barney v.
Keokuk, 94 U. S. 324; 1 Farnham on Waters and Water
Rights, p. 565.   Thus it will be seen that streets and
wharves are treated as one and the same.

GANTT, J.—This is an original proceeding in this court to obtain a mandamus from this court against the mayor and officers of the city of Hannibal in their official capacity to cancel and revoke the license and franchise granted by certain ordinances of the said city to the Chicago, Burlington & Quincy Railroad company to build and operate its railroad tracks upon and across the public levee of the city of Hannibal and to require the said railroad company to immediately cease operation under said franchise or license and to remove any and all obstruction now placed or being placed upon said public levee by virtue of the said ordinance.

The petition states that the relator is a citizen of Hannibal and a householder and taxpayer therein, and that he brings this suit on behalf of himself and other residents and taxpayers of said city; that the respondents are the mayor and city council of said city, and the defendant the Chicago, Burlington & Quincy Railroad Company is a duly organized and chartered railroad company owning and operating a line of railroads through the State of Missouri and the city of Hannibal; that the charter of the said city provides among other things that the said city shall have power "to prevent and remove all encroachments or incumbrances upon all streets, lanes, avenues and alleys established by law or ordinance." That in the year 1830 Stephen Glascock, who was then the owner in fee of the land, made, executed and filed a plat of the city of Hannibal, which said plat was duly acknowledged and filed of record and deposited in the recorder's office of the county of Marion in the State of Missouri, in which said city is located. That upon said plat the said Stephen Glascock, as the owner in fee of the land upon which said city was located, laid out and platted streets, alleys and other public grounds in said city, and duly dedicated the same as such streets,

alleys and other public grounds to the public generally
for the use of the public for such uses as designated
upon said plat; that among other public lands located,
designated, dedicated and named upon said plat was
a piece of ground located and designated on the plat
and marked as a "public levee" or "public land-
ing," and duly dedicated as such public levee to the
use of the public generally and as a steamboat landing
on the Mississippi river; that said public levee and
piece of ground, so dedicated and named as a public
levee, was duly platted and located between the south
line of Broadway street, the east line of First street
and the south line of North street, so named on said
plat, it being a piece of ground located between said
First street on the west and low-water mark on the
Mississippi river on the east, and between said streets
so named on the north and south. That said public
levee was duly accepted and used by the city of Han-
nibal as a public levee, and has been continuously used
by the public generally for a steamboat landing and
for the landing of steamboats on the Mississippi river
from the date of the filing of the said plat up to the
present time. That entering into and upon said pub-
lic landing on First street and on the east line of said
public landing are the following named streets:
Broadway, Center, Bird, Hill and North streets. That
the city of Hannibal is now a city of twenty thousand
population and said public landing is of great utility
and public benefit to the citizens of Hannibal generally
and to the common public. That the Mississippi river
is one of the greatest waterways and navigable streams
in the United States and is of great value in public
utility to the city of Hannibal as such navigable river
and would become more so in the future in view of the
great public interest now being had and taken for the
improvement of navigable rivers by the United States

government, for the transportation of freight and passengers on said river.

That on the third day of December, 1906, the mayor and city council of the city of Hannibal undertook to and did grant the right and franchise to the Chicago, Burlington & Quincy Railroad Company to construct over and upon said public landing a double-track railroad, with spur tracks and switch tracks as well, by an ordinance of that date, in consideration of which the said railroad company agreed to pay the city the sum of ten thousand dollars; that the said ordinance was accepted by the defendant railroad company; that before the acceptance of the said ordinance by the said railroad company amendments were made until the words "double tracks" were stretched into tracks and railroad tracks so that the restriction to a double track was obliterated and should the said railroad company be permitted to occupy or cross the said public landing, there is enough in this amendment of the said ordinance to tie the city's hands if it should endeavor to prevent the railroad company from constructing any number of tracks and making a switchyard of the public levee and destroy it as a public landing; that it is a well established rule of law that, when the owner of the fee dedicates certain lands to specific uses forever, such uses were solely in the mind of the donor at the time he filed his plat, and that Stephen Glascock when he filed a plat of the city of Hannibal had in mind a perpetuation of a public levee for steamboat landing and for the perpetual use of such landing by the general public forever, and the city had no power to divert such designated public use to any other use, public or private, for gain or no gain, but that the only power the city had over said levee is the power to control and maintain the same for a public levee for the use of the public; that should the said railroad company be permitted to take pos-

session of said levee and built a double track across the length thereof along the river front as it proposes to do according to a plat and blue print on file in the city, such tracks will practically run through the center of said public levee the entire length thereof, and as the railroad company proposes to construct said tracks so as to avoid the effect of the rise and fall of the river, the tracks would have to be lifted to a height of over six feet above the present surface of said levee and boat landing, and thus would cut off the egress and ingress over said levee through the steamboat landing for loading and unloading freight and passengers. That the Mississippi river often changes its high-water line on the said levee as far up as the east line of First street on the western side of the said levee, and said railroad track if constructed as proposed would in time of high water in the river entirely destroy the use of the levee in shipping freight or unloading freight; that the city in attempting to grant said franchise to the said railroad company subserves no public interest, but only the private interest of the defendant railroad company in furthering its desire and purpose of destroying freight and passenger transportation upon the Mississippi river at Hannibal. That the said railroad company now has ample track facilities for the running of its trains into and through Hannibal and to the union depot in said city by the present use it is now making of First street along the west line of said public levee. The pleader thus pleads the necessity for immediate relief in the premises.

An alternative writ was granted by this court returnable on December 15, 1909. On that date, the respondents filed their return, in which they admitted that the respondents named as mayor and city councilmen were the duly qualified officers of the said city and that the city of Hannibal was a municipal corpora-

tion organized and existing by virtue of a special charter, and that the defendant railroad company was a duly organized railroad corporation operating a railroad in and through this State and in and through the city of Hannibal. Admits that in 1836 Stephen Glascock laid off the lots and blocks and dedicated certain streets, alleys, public parks and public landings in the city of Hannibal and duly filed a plat thereof in the recorder's office of Marion county, and admitted that among other public lands located and designated upon said plat was a piece of ground marked as public levee or landing, and that said track lies between the Mississippi river and blocks 2, 4, 5, 6, 7, 8 and 33, and that said public levee was accepted by the city of Hannibal and has been partially so used. They admitted that First street, Broadway, Center, Bird, Hill and North street entered into said public levee. They admitted that said levee is of utility and public benefit and that the Mississippi river of course was a navigable stream and of great public benefit and utility.

Respondents admitted that the council of said city passed an ordinance which was duly approved by the mayor on December 12, 1906, and was accepted by the said railroad company on December 27, 1906, a copy of which was annexed to their return and made a part thereof and asserted that what purported to be a copy thereof in plaintiff's petition was not a full and true copy of said ordinance.

Respondents state that thereafter the council of said city passed an ordinance amending the above mentioned ordinance on November 4, 1907, which was approved November 5, 1907, and was accepted by the said railroad company November 27, 1907, a copy of which is annexed to their return. Respondents deny that by the said amendment the words "double track" were changed so as to give said company an unlimited number of tracks across said levee, but charge the

fact to be that under section one of the said ordinance first above mentioned the said railroad company was granted a right of way for, and the right to locate, construct and use, only a double track railroad across, over and along the said levee or landing and said section one was not in any wise changed, amended or altered in the second ordinance above mentioned.

Respondents admit that the railroad company agreed to pay and did pay the city of Hannibal the sum of ten thousand dollars for the privilege of laying said tracks and in addition thereto said railroad company is required to improve said levee at a cost of about $75,000. They deny that if the said railroad company is permitted to build a double track across and upon said public levee it will obstruct the same and deny that said tracks will be lifted to a height of over six feet above the levee and boat landing and thus cut off the egress and ingress of the public generally from the said levee of the steamboat landing for loading and unloading freight and passengers, and deny that it will in any way interfere with the free, full and convenient use of said property for ferry and boat landing purposes, but on the contrary charge the facts to be that a greater area of ground will be appropriated for public use as a public levee and for ferry and boat landings and that such improvements will greatly benefit the said levee for such uses; respondents deny that if said double track is so constructed as proposed it would in time of high water destroy the use of the levee as a steamboat landing and the use of the public of the levee in shipping freight and passengers from steamboats upon said landing, but on the contrary it will greatly aid and benefit said landing and the loading and unloading of freight. Respondents further say that under sections 4, 5, 6 and 11 of the amending ordinance, said railroad company is required to establish such grades on the

different parts of the said levee as will not interfere with the use of the same for landing and levee purposes but such as will assist the public in said uses; that said railroad company is required after such grades are established to pave with limestone rock the said levee and landing, and to construct and maintain in good order safe and convenient crossings at points where its tracks intersect all streets abutting on the said levee and landing and at any and every point deemed necessary by the city, and said railroad company is denied the use of said double track for the storage of cars or for switching purposes and required to maintain and use said double track so that the free use of said levee and landing by the public will not be hindered, obstructed or prevented.

Respondents deny that the city of Hannibal in granting said franchise only subserves a private interest of said railroad company and deny that it was its desire and purpose to destroy freight and passenger transportation upon the Mississippi river at Hannibal, but say that by the exercise of such franchise rights the public generally will be greatly benefitted and that freight and passenger transportation on the Mississippi river at Hannibal will be greatly enhanced thereby. The respondents say that it is not true that said railroad company now has ample track facilities for the operation of its trains into and through said city of Hannibal and to the union depot in said city by the use it is now making of First street, but on the contrary say that said railroad company does not own any track or tracks across or upon said levee and by reason of topographical condition neither said railroad company nor any other railroad company could have an inlet or outlet to and from the city of Hannibal in the direction of north and south except by passing over a part of said levee or landing. They denied each and every allegation in the relator's peti-

tion not expressly herein admitted. Further answering respondents say they are not contriving to deprive the citizens of said city or the public generally of their beneficial rights in or to the use of said levee or any part thereof, but that said railroad company intends to lay a double track and operate trains over and upon and across said lands lawfully and in accordance with said ordinance and that the same has been done by other companies since the year 1868, and said use will not in any way interfere with the use of said land for levee, wharf or ferry purposes, and said use will not be diverted from the uses and purposes for which said levee was dedicated, acquired, accepted and held, and is in entire accordance with the general dedication of said land. That the right of the said railroad company in laying and operating its said double track is subordinated to the rights of the public, does not obstruct or interfere with the same, and the said public levee or landing will be of greater benefit to the public after it is graded, paved and improved as said railroad is required to do under said ordinance than ever before.

Respondents say that the city of Hannibal, through its mayor and council, has full power to regulate and repair, to alter and improve, and to extend or diminish or abolish its said public levee or landing, and has full power and authority to permit the said railroad company to lay a double track across said public levee, provided said double track is so constructed and used as not to unnecessarily impair the usefulness of said public levee and landing. That said city has frequently by ordinances during and since the year 1868 permitted and allowed railroad tracks to be laid in and upon a part of said public levee by other railroad companies than the respondent railroad company, and said tracks have been so laid and used for the operation of trains thereon for more than forty

years without interfering with the public use of said levee; that said city maintains and operates on said levee a large and expensive electric light plant costing one hundred thousand dollars; that the large amount of land dedicated as a public levee enabled this to be done without interfering with its use as a public levee. That during all the time since the dedication of said land as a public levee in 1836, but meager improvements have been made on a small portion of the same for the use of a boat-landing and that at the present time and in its present condition not more than one or two boats can land at the same time, and at high-water stages landing cannot be made at all; that a large portion of said levee is wholly unimproved and up to the present time has been allowed to remain in its natural wild condition, because it was not necessary or needed for levee purposes; that under the terms and provisions of the ordinance in question all of said public levee landing will be repaired and filled in, graded, paved and so enlarged, bettered and improved that boats and vessels in great numbers can land at all stages of water with ease and convenience, and load and unload passengers and freight, and the public generally can more easily and beneficially use the same; that said ordinance so safeguards the rights of the public levee and landing for the purposes intended that the same are fully preserved and in no wise impaired or interfered with by the laying of said double track. That the respondent railroad company has fully complied with the terms and provisions of said ordinance so far as it has proceeded in the exercise of the rights therein granted, and stands ready and willing so to do in the further exercise of the rights granted, and to prevent the same would greatly injure the public in a just, reasonable and proper use of a part of said levee.

The relator filed a denial of the return of the alternative writ and denied generally that the matters in fact therein pleaded constituted any reason why a peremptory writ of mandamus should not issue in his behalf, and pleaded specially among other things an ordinance of the said city entitled an ordinance to protect the possessions and property of the city of Hannibal, which, in brief words, made it a misdemeanor for any individual or corporation to occupy or use any part of said levee for individual or corporate private purposes, or to maintain or have any part of said levee enclosed or to have any hut or shanty, house or building of any kind thereon, or occupy the same as an abode or habitation or lodging place, and making it the duty of the marshal of the city to clear off and remove all constructions found vacant and unoccupied on said levee front, and to compel the removal of all boat houses or house boats either vacant or uninhabited which might be grounded or beached on any part of said levee over or in said harbor of said city west of the main line of the Mississippi river, and to maintain a patrol on said levee front at all hours. He admits that the city of Hannibal passed the amending ordinance, stated and set out in respondent's return, approved November 5, 1907, but says that said ordinance constitutes no defense to the alternative writ issued in this cause and alleges that the said ordinance and the original ordinance are both void and of no effect against the public right to the maintenance and use of the entire public landing for the common use of the public to its full extent and description, and because said ordinance and the amendments thereto authorize or attempt to authorize the respondent railroad company to destroy one thousand lineal feet of said public landing without any restrictions or provisions that the same shall be restored as a public levee as dedicated for the use of the public generally,

and denies specifically the other matter alleged in the return of the respondents.

After the issues were made up, Judge Theodore Brace was appointed as special commissioner of this court to take the testimony upon the issues joined in this cause, and directed to report the testimony with his findings of fact thereon, together with his findings as to the law upon each issue tendered to him by the respective parties, and state his conclusions of law in his final report. In due time the commissioner filed his report, together with the testimony taken and heard by him. From the pleadings and evidence in the case the commissioner finds that on the 17th of April, 1836, Stephen Glascock, then being the owner in fee of the premises in question, by plat duly acknowledged and recorded laying off the town, now the city, of Hannibal under the then existing law, dedicated the same to the public use for a "public landing" within and for said town on the west shore of the Mississippi river. As thus dedicated the premises were accepted and ever since have been treated and used by the public and the town, now the city, of Hannibal as a public landing, or levee, as it is more frequently designated, and the city passed ordinances for the regulation of its use and for the protection thereof. The name of Market street was changed to Broadway. Among other ordinances on the 31st of March, 1855, a right of way was granted to the Hannibal & St. Joseph Railroad Company to "construct a branch with one or more tracks from some convenient point on the main line as aforesaid to and over the present public landing of said city." On the 4th of May, 1868, a right of way was granted to the Hannibal & Central Missouri Railroad Company to construct their road or branch thereof with one or more tracks to and over the present landing of said city. In pursu-

ance of this later grant tracks were laid along First street and the west side of the public landing, which are now, and ever since have been, operated by the Missouri, Kansas and Texas and the Wabash Railroad Companies. In the years 1906 and 1907 the city council of the city of Hannibal passed the ordinances which are challenged in this proceeding. The first of these ordinances was an ordinance "granting to the Chicago, Burlington and Quincy Railroad Company, its lessees, successors and assigns the right to construct, maintain and operate railroad tracks across the public levee and certain streets and lots in the city of Hannibal and the selling of parts of lots 1, 2, 3 in block two of said city." Section one of said ordinance provided that said railroad company, its lessees, successors and assigns "are hereby granted the right of way and the right to locate, construct, maintain and operate a double-track railroad crossing over and along the public levee of the city of Hannibal and crossing the public premises, land, lots, streets, alleys and other public places of the city of Hannibal as follows"; [here follows the minute description of the commencement and direction and destination to be occupied by the said double-railroad track granted to the said company.] All designated by a plat filed with and made a part of the said ordinance and a grant of lots one, two and three in block two of the city of Hannibal. Section three of the said ordinance provides that as a consideration of the said land, rights and franchises granted, said railroad company agreed to pay to the city the sum of ten thousand dollars. Section four provides that the said railroad company should construct at its own cost a levee and roadway as follows:

"From the south side of Broadway, extended, to the north side of Hill street, extended, consisting of

a limestone paved levee from the south side of Broadway, extended, to the south side of Bird street, extended, a distance of about seven hundred and fifty feet. The levee at Broadway extended to be two hundred and twenty-four feet wide, and to have a grade feet not to exceed seven feet in one hundred feet. At Center street, extended, levee to be one hundred and forty-eight feet wide and have a grade of not to exceed eleven feet in one hundred feet.

"The levee opposite the north end of the new electric light house to be one hundred and twenty feet wide and the grade not to exceed 12 per cent and corresponding grades between said lines. At Bird street, extended, the levee will have a width of one hundred feet. Direct access to be given to the levee at Broadway, Center, Bird and Hill streets, extended.

"It is also agreed that the said railroad company shall fill in the levels on the plat hereinafter referred to, and prepare in a proper condition for the passage of teams that part of the public levee along the Mississippi river within the limits between the south line of Broadway, extended, and the south line of Bird street, extended.

"After the same has been filled in as stated, the surface thereof within the said limits shall be paved with limestone to a depth of eighteen inches laid on a sand foundation and all the joints thoroughly filled with sand or gravel. That portion of the said levee between the south line of Bird street, extended, and the north line of Hill street, extended, shall be provided with a good and sufficient roadway, constructed of crushed stone and giving easy access to both boathouse and levee.

"The said railroad company shall also fill with sand, or some other suitable material, the spaces between the said tracks within the limits of said levee, and also between its tracks and the east Missouri,

Kansas & Texas tracks. The said railroad company shall repair all defects in the original construction of said levee, as hereinbefore provided for.

"The levels, grades and extent of the said public levee to be constructed by the said railroad company as contemplated by this section, are more particularly shown on the plat herewith filed and made a part thereof, marked "Exhibit B." And shall put a good iron boat fastening along said levee every one hundred feet apart."

The remaining sections of said ordinance providing for crossings, sewers, ferry approach, etc., are as follows:

"Section 5. *Crossings.* The said railroad company also agrees to construct and maintain safe and convenient crossing at grade where its tracks would intersect the following streets if extended to the Mississippi river, *viz.*, Broadway, Center, Bird and Hill streets, the full width of said streets.

"Section 6. *Sewers.* The existing sewers on Broadway, Center streets, Bird street and Hill street, now terminating at the east side of the Missouri, Kansas & Texas Railway tracks, are to be extended to the river by said railroad company, the same to be securely constructed of concrete.

"Section 7. *Ferry Approach.* The railroad company also agrees to construct a suitable roadway crossing its tracks on lot three, block fifty, in Ferry road, as an approach to the present ferry operated near Ferry street in the city of Hannibal and a good roadway approach over part of lots three and four, block fifty, to the ferry landing, not less than twenty-four feet wide, with a grade not more than eight per cent and properly rock rip-rapped on the river side, so as to prevent erosion, and so constructed as to permit of convenient and practicable boat-landing at all stages of the river, and so more particularly shown by plat

marked 'Exhibit C,' filed and made a part hereof, and to be satisfactory to the Ferry company.

"Section 8. *Intake.* The said railroad company shall construct a good and sufficient cement or stone archway for intake pipes from the electric light plant to the river, satisfactory to the superintendent of the electric light plant, and pay any other necessary expense occasioned by the construction of said tracks, including the connecting of the downspouts from electric light building with the sewers in Center street.

"Section 9. *Electric Light Poles.* The said railroad company shall replace in first-class condition all electric light wires and poles necessarily removed in the construction of said tracks and levee, satisfactory to the superintendent of the electric light plant.

"Section 10. *Supervision of Work.* All improvements and all construction work required by the provision of this ordinance shall be done under the inspection and with the approval of the city engineer of said city.

"Section 11. *Conditions and Bonds.* The levee shall be built along with and at the same time the tracks are constructed, and all the work shall be completed within three years from the acceptance of this ordinance, if not prevented by high water.

"The railroad tracks herein provided for shall not be used for storage of cars or switchyards.

"And the railroad company shall, before beginning of the work herein provided for, give a good and sufficient bond in the sum of twenty-five thousand dollars, to be approved by the mayor of said city, for the faithful performance of all the work and improvements required by this ordinance.

"Section 12. *Acceptance.* This ordinance, after its passage by the city council and approved by the mayor, shall not be in force and effect unless said ten thousand dollars are paid and the provisions hereof

accepted in writing by the said Railroad company, by J. H. Carroll, general attorney for said company, within thirty days from the date of its approval, which written acceptance shall be filed with the city clerk.''

The ordinance of November 4, 1907, was in these words:

"An Ordinance.

"To amend an ordinance entitled 'An ordinance granting to the Chicago, Burlington & Quincy Railroad Company, its lessees, successors or assigns, the right to construct, maintain and operate railroad tracks across the public levee and certain streets and lots in the city of Hannibal, and the sale of parts of lots one, two and three in block two of said city of Hannibal, adopted December 3, 1906, and approved December 12, 1906.

"Be it ordered by the City Council of the City of Hannibal:

"Section 1. That an ordinance entitled 'An ordinance granting to the Chicago, Burlington & Quincy Railroad Company, its lessees, successors and assigns, the right to construct, maintain and operate railroad tracks across the public levee and certain streets and lots in the city of Hannibal, and the sale of parts of lots one, two and three in block two of said city of Hannibal,' be and the same is hereby amended by repealing section two thereof.

"Section 2. That section four of said ordinance entitled 'Levee' is hereby amended by inserting after the word 'extended' at the end of the second paragraph, the words 'and said railroad company shall not erect any fence on said levee along said right of way,' so that said section, as amended, shall read:

"Section 4. Levee. The said railroad company shall construct at its own cost a levee and roadways described as follows:

"From the south side of Broadway, extended, to the north side of Hill street, extended, consisting of a limestone paved levee from the south line of Broadway, extended, to the south line of Bird street, extended, a distance of about seven hundred and fifty feet. The levee at Broadway, extended, to be two hundred and twenty-four feet wide, and to have a grade not to exceed seven feet in one hundred feet.

"At Center street, extended, levee to be one hundred and forty-eight feet wide, and to have a grade not to exceed eleven feet in one hundred feet. The levee opposite the north end of the new electric light house to be one hundred and twenty feet wide, and the grade not to exceed twelve per cent, and corresponding grades between said lines.

"At Bird street extended, the levee will have a width of one hundred feet. Direct access to be given to the levee at Broadway, Center, Bird and Hill streets, extended, and said railroad company shall not erect any fences on said levee along said right of way.

"It is also agreed that said railroad company shall fill in the levels on the plats hereafter referred to, and prepare in a proper condition for the passage of teams at that part of the public levee along the Mississippi river within the limits between the south line of Broadway, extended, and the south line of Bird street, extended.

"After the same has been filled in as stated, the surface thereof within the said limits shall be paved with limestone to a depth of eighteen inches, laid on a sand foundation and all joints thoroughly filled with sand and gravel. The portion of said levee between the south line of Bird, extended, and the north line of Hill street, extended, shall be provided with a good and sufficient roadway, constructed of crushed stone, and giving easy access to both boathouse and levee. The said railroad company shall also fill with sand or

some other suitable material, the space between the said tracks and the east Missouri, Kansas & Texas track.

"The said railroad company shall repair all defects in the original construction of said levee as hereinbefore provided for. The levels, grade and extent of the said public levee to be constructed by the said railroad company, as contemplated by this section, are more particularly shown on the plat herewith filed and made a part hereof, marked 'Exhibit B.' And shall put in good iron boat fastenings along said levee every one hundred feet.

"Section 3. That section 5 of said ordinance, entitled 'Crossings,' be and the same is hereby amended by inserting in the first part of said section between the words 'maintain' and 'safe' the words 'in good order,' and by adding to the end of said section the words 'and shall construct and maintain such other crossings across said tracks as the city council may by resolution hereafter direct,' so that said section as amended shall read:

"Section 5. *Crossing.* The said railroad company also agrees to construct and maintain in good order safe and convenient crossing at grade where its tracks would intersect the following streets if extended to the Mississippi river, *viz*: Broadway, Center, Bird, and Hill streets, the full width of said streets, and shall also construct and maintain such other crossings across said tracks as the city council may by resolution hereafter direct.

"Section 4. That section 6 of said ordinance, entitled 'Sewers' be and the same is hereby amended by adding at the end of said section the words, 'and said railroad company shall make sufficient provisions for the carrying off and discharging of surface water into the Mississippi river at all other streets intersect-

229 Sup—15

ing its said tracks,' so that said section as amended shall read:

"Section 6. *Sewers.* The existing sewers on Bradway, Center street, Bird street, and Hill street, now terminating in the east side of the Missouri, Kansas & Texas railway tracks, are to be extended to the river by said railroad company, the same to be securely constructed of concrete; and said railroad company shall make sufficient provisions for the carrying off and discharge of surface water into the Mississippi river at all other streets intersecting its tracks.

"Section 5. That section 11 of the ordinance, entitled 'Conditions and Bond,' be and the same is hereby repealed and a new section is enacted in lieu thereof, to be known as section 11, as follows:

"Section 11. *Conditions and Bond.* The levee shall be built along with and at the same time the tracks are constructed, and all the work required by this ordinance shall be built, constructed and completed within three years from the acceptance of the amended ordinance if not prevented by high water, or the rights and franchises herein specified shall forthwith cease without action on the part of said city.

"The railroad tracks shall not be used for storage of cars or for switchyards, and the railroad company shall so maintain and use its said proposed tracks as that the free public use of said public levee will not be unnecessarily hindered, obstructed or prevented.

"Any failure on the part of the railroad company to comply with any of the terms, provisions or requirements of this ordinance shall operate as a forfeiture of all rights and privileges herein granted, without a forfeiture to be left to the courts.

"And the said railroad company shall, before the beginning of the work herein provided for, give a good and sufficient bond in the sum of twenty-five thousand dollars, to be approved by the mayor of said city, for

the faithful performance of all the work and improvements required by this ordinance.

"Section 6.   This amended ordinance, after its passage by the city council and approved by the mayor, shall not be in force and effect unless the provisions thereof are accepted in writing by the said railroad company, by J. H. Carroll, general attorney for said company, within thirty days from the date of its approval, which written acceptance shall be filed with the city clerk."

These ordinances were duly accepted by the railroad company and the ten thousand dollars was paid by it to the city.   These were the ordinances in question under which the respondents claim and of which the relator complains.   The commissioner also filed with his report a diagram, produced from the blue print on file with the pleadings and evidence, which shows the public landing as it will appear should the tracks of the respondent railroad company be constructed in pursuance with the two ordinances.   The commissioner then finds that the proposed double tracks would enter upon the north end of the public landing and run in a general southerly direction about in the center thereof, considering First street as a part of the public landing, over the entire length thereof, a distance of 1488 feet; and the width of the space to be occupied by them is twenty-two feet.   The single steam track is to run from about the north extended line of Center street, in a southwesterly direction, to the south line of the public landing, occupying for that distance a space the usual width of a standard guage track.   The double tracks are to become a part of respondent's north and south main line of railroad.   The spur track is to give access to the union station.   The respondent railroad company has no line of tracks north and south through the city of Hannibal, and in order to make connection between

its north and south tracks and gain access to the union station, is compelled to run its trains over the tracks of the Missouri, Kansas & Texas and Wabash railroad on First street and the western part of the levee as shown in the diagram. Owing to the topography of the country and the fact that the main business portion of the city, compactly built, practically abuts on the levee, the only practical way of making such a connection is by passing over the levee. The tracks are to be eighteen inches higher than the present tracks on First street and the west side of the levee. They are to be used exclusively for the benefit of the respondent railroad company only for the passage of its trains and not at all in connection with or in aid of river traffic. The improvements provided for in the ordinances are not for the benefit of that traffic. In pursuance thereof a good, substantial, properly paved and graded levee is to be constructed by the respondent railroad company between the proposed tracks and the river from the south line of Broadway, extended, to the north line of Hill street, extended, a distance of about 750 feet, with a width at Broadway, extended, of 224 feet; at Center street, extended, 148 feet; at Bird street, extended, 100 feet; at new electric light plant house, 120 feet wide, and good, safe and convenient crossings are to be constructed and maintained where the tracks would intersect Broadway, Center, Bird and Hill streets, extended, the full width thereof, and such other crossings across said tracks as the city council may by resolution hereafter direct, and the space between the proposed tracks and the east line of the tracks now on the west side of the premises are to be filled in with sand or other suitable material. The boathouse, now at right angles with the landing and the river, is to be changed so as to be parallel therewith, thus affording a large facility for the landing of boats. The esti-

mated cost of these improvements is $50,000. If made, Hannibal will then have for the first time a properly improved levee, adapted to river traffic, of the dimensions aforesaid, the remainder of the public landing north of Hill street, extended, remaining unimproved, as always heretofore it has been.

The sum and substance of the evidence, the commissioner finds, is that the improvements provided for in the ordinance in and of themselves will be of great and permanent benefit to the premises for the public landing, and the only impairment of the uses thereof as such, by the proposed tracks, will be the danger, delay and inconvenience that must necessarily result to the public from the ordinary use of such tracks by the railroad company in the passage of its trains thereon. The learned commissioner finds that the pleadings and the testimony present two questions of law in the case, first, whether this action can be maintained by the relator, who as a citizen and taxpayer of the city of Hannibal has no special interest in the landing, or any interest therein other than or different from any other citizen of Hannibal, and, second, is it within the power of the city of Hannibal to grant a franchise to the respondent railroad company such as is provided for in these ordinances and which will affect the public landing as aforesaid? As to the first proposition his conclusion is that the relator may bring and maintain an action for mandamus for failure to perform a duty which the respondent railroad company owes to the public and that mandamus is an appropriate remedy to compel the restoration of a highway to its former state. That it is sufficient in such cases for the relator to show that he is a citizen and thus interested in the performance of a public duty. [State ex rel. v. Railroad, 86 Mo. l. c. 16.] He says, "It may be conceded that if the respondent railroad company had laid its tracks on the public land-

ing or had commenced doing so and thereby had altered or disturbed the condition thereof to the injury of the public use to which it had been dedicated, it might by mandamus be required to restore the same to the original condition. *But there is no evidence proving or tending to prove* that when this proceeding was instituted the said respondent had laid or commenced laying these tracks or had in any manner altered or disturbed the condition of the landing to the injury or detriment of the public use to which it had been dedicated. It has by its acts incurred no duty to the public which it could be constrained to perform by mandamus. . . . The relief sought is, in fact, purely injunctive, and while injunctive relief may sometimes be granted as a mere incident of the writ of mandamus, that writ cannot be made to take the place and perform the office of an original writ of injunction and thereby confer upon the Supreme Court of the State a jurisdiction not given to it by the Constitution. [Lane v. Charless, 5 Mo. 285; Vail v. Dinning, 44 Mo. 210; State ex rel. v. Wilson, 49 Mo. 152.]''

As to the second proposition his conclusion of law is that the city of Hannibal is without power to authorize the laying of the said tracks upon the public landing, and that said ordinances are *ultra vires* and confer no right upon the respondent railroad company to lay them thereon as therein provided at all. That while it is true that the improvements provided for by the ordinances are consistent with the purposes of the dedication and will aid and benefit its use by boats and the public as a landing, it is not true that the proposed tracks will aid and benefit its use by boats, and the public as a landing. That it is not true that their construction and use will be consistent with the purposes of the dedication, and it is not true that their use will not impose an additional burden upon the use of the landing for the purposes for which it was dedi-

cated. That the proposed use is not in aid of, but variant from, antagonistic to, and inconsistent with the use to which the landing was dedicated, and the city could no more grant the franchise for the sake of the improvements than it could for their value in money.

I. The commissioner's conclusion of law upon the facts found by him and abundantly established by the evidence, that at the time this proceeding was instituted the respondent railroad company had not in any manner obstructed the public landing and that therefore mandamus could not be invoked to prevent the threatened action, contemplated by the ordinances and the contract of the respondent railroad company with the city, we think undeniable. For such a threatened use of the levee, if otherwise maintainable, injunction alone could be the remedy, but this court has no power under the Constitution to issue an injunction under the grant to it of the power to issue original remedy writs. [Constitution of Missouri, art. 6, sec. 3; Lane v. Charless, 5 Mo. 285; Vail v. Dinning, 44 Mo. 210; State ex rel. v. Wilson, 49 Mo. 152.]

It necessarily follows that the alternative writ of mandamus issued in this case must, for this reason, if no other, be quashed, and we might content ourselves with this disposition of the case, but it seems to us that this would be a most unsatisfactory adjustment of a cause involving such vital interests to all parties concerned in the litigation, and wherein all the parties are before the court and the rights of the city, the relator, and of the respondent railroad have been pleaded and fully argued both orally and in brief. It appears to us that it is to the interest of all parties that the real merits of the case should now be determined instead of sending the parties out of court to renew

the contest in a different form and to delay the final adjustment of their different rights.

Accordingly we will consider the second conclusion of law reached by the special commissioner, to-wit, that the ordinances of the city of Hannibal granting the respondent railroad company the right to lay a double track railroad across the said landing or levee, are *ultra vires* and without authority of law.

II. "A [public] landing is a place on a river or other navigable water for lading or unlading goods or for the reception and delivery of passengers." [State v. Randall, 1 Strob. (S. C.) 110; Coffin v. Portland, 27 Fed. 418; St. Paul v. Railroad, 68 N. W. 460.] It is a general proposition of law that a grant for a specific, limited and definite public use cannot be diverted to a different and inconsistent use. Under our system of government the Legislature has no power to destroy the trust or to divert it directly, or authorize a municipality to divert it to a purpose inconsistent with the particular use to which it has been dedicated. The Legislature unquestionably may directly, or by grant to a municipality, regulate the use or promote the improvement of a public landing or levee, dedicated to the public, as the landing in this case clearly was, but it cannot divert or subject it to a use inconsistent with the purpose of its dedication.

The city of Hannibal holds the said tract so set apart by Stephen Glascock for a public landing in trust for the use of the general public for that use; it cannot sell it, or divert it to any inconsistent or antagonistic use. To state, however, that the said tract cannot be subjected to any other use or burden than the loading or unloading of freight on or from vessels touching it on the Mississippi river, or the receipt or discharge of passengers from such vessels, we think is too strong a statement, in view of the course of

judicial interpretation in this country, especially if the new use or burden is the result of steps taken by the State or city with a view to the improvement of the landing so as to afford enlarged facilities for accomplishing the purpose of the dedication and thus effectuate the grant itself without diverting or destroying the contemplated use.

A careful scrutiny of the testimony will, we are sure, demonstrate that though the dedication of this landing was made in 1836, it has never been, to this time, improved in such a substantial way as to afford proper facilities for the loading and unloading of freight and passengers. The learned commissioner correctly says: "The estimated cost of these improvements is $50,000. If made (as provided in these ordinances, by respondent railroad) Hannibal will then *for the first time* have a properly improved levee adapted to river traffic of the dimensions aforesaid."

Mr. Hinton, a long time resident of Hannibal, testified: "I am familiar with the public landing and have been for the last thirty-five years. My business brought me in direct contact with the river and river traffic. Boats have always landed between Bird and Hill streets except in high water. When there was a twenty-foot stage of water there was only one place in Hannibal where the steamboats could land, under the present conditions; that is a little knoll right south of the ferry-landing, Ferry street, it is two blocks north of the public landing. The grade there is good and steep. Boats land there by tying to the railroad track and throwing their stage planks out over the railroad track and depositing their freight on Ferry street, the only place, in fact, that a boat can get in to land at in any place in a twenty-foot stage of water or more. It is practically landing up against the present Wabash tracks and embankments at Ferry street and throwing the gang plank across those planks and de-

positing freight on the west side of the tracks; that is,
the tracks away from the river. I am familiar with
the contemplated improvements on the levee of the
landing and the laying of the proposed Burlington
tracks across the same. It will be of great benefit to
the public landing for landing purposes and for use as
a landing by the public. It will not interfere in any
way with its use as a public landing but will greatly
aid the public and the boats in the use of the public
landing. The reason to me is plain. If those double
tracks are built up to a twenty-four foot stage, as con-
templated, which is eighteen inches higher than the
grade of the present tracks on the west side of the
public landing or First street, and which would be a
foot and six inches above the highest water we have
ever had in Hannibal, it would enable a steamboat to
land at any point between Broadway and High street,
whereas they could not possibly get in there now at a
twenty-foot stage and it would make during high
water a landing over the whole three blocks, and dur-
ing low water it would certainly make the landing in
every way better, because being graded and paved, it
would enable teams to get down to the water wherever
the boat happened to be. Now I don't think a team
could at any point south of Bird street get near the
river. It is nothing but an uneven, slanting, mud
bank.''

Col. Robards, another prominent and old citizen
of Hannibal, testified that the improvements would be
of great benefit to the landing, but the railroad tracks
would prove an element of danger. Indeed, it is too
obvious for discussion that if this public landing is
ever to be available for an enlarged river traffic it
must be graded, paved and improved, and unlike
streets and alleys, the city cannot resort to special as-
sessments upon abutting property to get the funds to
make the requisite improvements, and as the power

has been delegated to the city to regulate and improve the landing, it must be presumed that it has been without revenue to do so out of the general revenues of the city, and this court should hesitate to adjudge the ordinances passed for the purpose of securing that improvement *ultra vires*. The ground upon which the relator assails the validity of these ordinances is that the grant of the right of way for a double track across this landing is such a diversion of the use to a different and antagonistic use that they cannot be upheld, whereas the city and respondent railroad insist that the grant of the right of way merely for the passage of trains, with the express negative of any right in the railroad to occupy the landing with depots, warehouses or other permanent structures, and the provision that the company shall not do switching upon said tracks, is not destructive of the original purpose of the dedication, but is simply one of those incidents that the grantor must have contemplated when he made the dedication of the dimensions in the place that he did.

A review of the adjudications of this and kindred questions will aid in the proper solution of this controversy.

In Steele v. Empsom, 142 Ind. l. c. 405, the establishment of a ditch under the drainage act of that State had been assailed and among other objections to the proceeding it was insisted that the ditch was partly located on the right of way of the O. & M. Ry. Co. and that such location was unauthorized for the reason that property once taken and appropriated to public use could not be again appropriated to another public use, as had been ruled in that State in city of Valparaiso v. Ry. Co., 123 Ind. 467. But the same court said: "The rule urged by appellant only applies when the second public use would naturally injure or destroy the uses for which such right of way was employed,

and when the same could not exist without impairing the first uses. [Railroad v. Anderson, 139 Ind. 490 and cases cited.] It is not claimed, nor does the evidence show, that the location of the drain upon the right of way would in any way interfere with the uses of the railroad company. On the contrary, it was found it would be a benefit to said right of way.''

In Railway Co. v. Starkweather, 97 Iowa 159, the city of Boyden prosecuted a proceeding to condemn a street crossing through depot grounds of the railway and the road insisted that as its property was held for a public use, it could not be condemned, but the court held that while the property was held for public use, that use would not be materially affected by making the street. ''The extension of the street as proposed will cause some inconvenience to the plaintiff in the operation of its trains, and will interfere with a platform of cinders which was constructed across the strip of land, but the inconvenience thus caused will be inconsiderable as compared with the benefit to the public which will result from the opening of the street. . . . . The exclusive right to use the railroad as such will remain in the railroad and the public will have the right to cross it at proper times and by suitable means. In St. Paul Union Depot Co. v. City of St. Paul, 15 N. W. (Minn.) 684, it was held that the city could not take for a street, real estate which the depot company had acquired for its use, where that use was necessarily exclusive, and it would be practically subverted by the proposed taking and use for the street. But it was said that 'the power to extend streets and highways across railway tracks at suitable and convenient places, is necessarily implied in the general authority conferred on cities and towns for such purposes, without express provisions on the subject. In like manner, railroads necessarily cross streets and highways on their routes. An adjustment

of the two public uses is thus demanded by public convenience and necessity, wherever practicable, and may well be presumed to be contemplated in the legislation authorizing such improvements and by corporations in accepting or acting under such legislation.' See also, Railroad v. Dayton, 23 O. St. 510; Railroad v. Railroad, 31 N. J. L. 213; Railroad v. Railroad, 112 Ill. 589; Bradley v. Railroad, 21 Conn. 305.''

In this State the right of way of railroad companies is subject to crossings by other railways and by streets and public roads, under proper limitations.

In City of Augusta v. Georgia R. R., 98 Ga. 161, it was held: ''Where, in the absence of express legislative authority to so appropriate the property devoted to a prior public use, it becomes important to inquire whether such power arises from necessary implication in a given case, the legislative intent is to be arrived at by applying the enactment to its subject-matter. In sparsely settled communities, it is possible to establish a public way across the track of a railroad company without serious embarrassment to the company in the exercise of its corporate franchises, and in such a way as the second use may be reasonably consistent with the first. If the conditions are such that they may be reasonably made to consist, there is no such encroachment upon the prior public use as even appreciably to impair, much less extinguish it, and therefore, even though some slight inconvenience may result to the prior occupant, there is no reason why a second public use, when granted even in general terms, may not be held to confer upon the public authorities the right in such manner to exercise it. A different result follows, however, when the enjoyment of the second use involves the practical extinguishment of the former, or renders its exercise so extremely inconvenient and hazardous as practically to destroy its value.''

In R. R. Co. v. City of Portland, 14 Oregon, 188, the public landing had been dedicated to public use by Coffin, the original patentee of the land. Afterwards the Legislature granted the railroad the right to occupy the same with track, side track and depot buildings, etc., provided the company should never charge any dockage to any boat, ship or vessel engaged in receiving or discharging cargoes at the wharf. The decision settled the right of the city and railroad. While the dedication was held irrevocable even by the Legislature, it was ruled that the placing of railroad tracks and a depot with wharfs and warehouses for the receipt and storage of freight, was not destructive of the use, but added to its efficiency, and that the act of the Legislature, in so far as it authorized a sale of the landing as such, exceeded their constitutional powers, but that the license to construct the track and depot did not exceed the legislative power and the act was not wholly void.

The principle involved was considered by this court in Belcher Sugar Refining Company v. St. Louis Grain Elevator Company, 82 Mo. 127, and the same case in 101 Mo. 192. The suit was by injunction to enjoin the defendant from maintaining a shed or warehouse upon the wharf of the city of St. Louis. The circuit court on the first trial dismissed the petition, which judgment was reversed and cause remanded by this court. The plaintiff was a corporation organized under the laws of this State, and the defendant was organized under a special act of December 18, 1863, the third section of which provided that a corporation thereby created should have power to acquire, by purchase or otherwise, real estate in the city of St. Louis fronting on the Mississippi river not exceeding five hundred feet frontage on the same, in any one locality; and said real estate so obtained should not be subject to condemnation for any purpose so long as it was to

be used for grain elevators and uses connected therewith, and the said company might erect one or more grain elevators upon the public wharf of the city of St. Louis with the consent and under the direction of the constituted authorities of said city. The elevators were to be so constructed as to give railroads a track way through the same and so as to accommodate the river interest for the elevating and storing grain in bulk and so as not to interfere with the navigation of the river. The corporate powers of the city of St. Louis on the subject were to establish and regulate public wharfs and docks and to collect wharfage, and the city was authorized to set aside or lease portions of the unpaved wharf for special purposes, such as elevators and warehouses and for railroad tracks, but no permit to use any portion of the wharf or any lease of the same should be granted for a term exceeding fifty years. In 1867 the wharf as established by ordinance was opened under condemnation proceedings instituted by the city and a large portion of blocks 225 and 226 belonging to the plaintiff were condemned. The plaintiff still, however, retained, at the commencement of that suit, a large tract in block 226, and on that property and on property owned by it in 225 there were buildings used by it in connection with its refining works. In 1879 the city leased to the defendant 298 feet of the wharf, being the entire river landing in front of block 226, for twenty years, upon an annual rental of three hundred dollars, and provided that the leased premises should be used by the defendant for maintaining a shed and warehouse for the storage and handling of grain in connection with its elevator. On the first appeal this court held that the city had no right under the original lease by the city to the defendant to make such a disposition of the property condemned for wharf purposes as would prevent the city in the event it became necessary to ex-

tend and pave the same, from doing its duty in that
respect, and that the Legislature could not give the
city the power to make such a use of the wharf prop-
erty.   Thereupon the city made a new lease with the
purpose of conforming with the opinion of this court,
and the suit was renewed and was decided by this
court in the 101 Missouri.   In the new lease the city
granted a term of fifteen years, instead of fifty years,
as in the original lease, and inserted these additional
stipulations: the city reserves the right to cancel the
lease on six months' notice in writing to the lessees,
whenever the city should elect to pave and extend the
wharf on the premises mentioned, and that the build-
ings and structures placed on the premises by the
lessee should be used by the lessee for the storage and
handling and loading and unloading of grain and
merchandise, and the loading and unloading of boats
and barges and railroad cars engaged in carrying the
same and for any other purpose and the city retained
control over the buildings erected by the lessee, and
over the ground covered by the lease and the right at
any time by ordinance, to prescribe regulations gov-
erning the business by the lessee.   This court said:
"The property in question was condemned for wharf
purposes, and it cannot be appropriated to a different
and inconsistent use, nor can it or any part thereof be
disposed of by the city for private purposes.   These
general propositions were asserted in strong terms
when the case was here before.   They are again con-
tended for on the one side, and conceded on the other,
so that on these points additional observations are
unnecessary.   The principal and important inquiry
presented by this record is two-fold: first, whether the
maintenance of a building upon the wharf to be used
in connection with defendant's elevator for storing
and handling grain and merchandise and for loading
and unloading boats and railroad cars, carrying such

freight, is a use incident to a public wharf; second, whether the erection and maintenance of the structure in this case is for private purposes only and an illegal use of the wharf for that reason.'' In consideration of these propositions, Judge BLACK, speaking for this court, said: ''There is a wide difference between a street and a wharf. Wharves on our rivers are not only ways for traveling, but they are necessarily used for the deposit of merchandise. The products of the soil and of the manufactories find there a legitimate place of temporary deposit, whether outgoing or incoming. There can be no doubt but a city, having only a general power to establish and regulate wharves, may erect sheds and warehouses thereon to protect such property from damage and theft, and the wharfage charges may be proportioned to the accommodations afforded. So, too, the maintenance of an elevator on a public wharf for handling grain thereat is no new or additional burden or servitude. It is simply a new method for using the wharf for the very purposes for which it was condemned or dedicated. . . . This much has been said concerning warehouses and grain elevators because the structure in question, though used in connection with defendant's elevator, is used for handling grain and other merchandise, and performs the duty of both a warehouse and an elevator. The erection and maintenance of such a structure is a proper and legitimate use of a portion of a public wharf, when used in handling property going to and from the same.'' The conclusion was that the elevator company was engaged in exercising a public trust, and was subject to public regulation, and the elevator was a business that might properly be conducted at and upon the wharf under the charter powers of the city. That it was a connecting link between the great

land and water common carriers, and the property was not leased for private purposes merely.

The learned commissioner in this case in his report says: "Owing to the topography of the country, and the fact that the main business portion of the city, compactly built, abuts on the levee, *the only practical way* of making such a connection is by passing over the levee." If it be true that this large tract of land cannot be touched otherwise than by boats landing at its water's edge and by ordinary teams hauling the freight to be loaded upon or unloaded from the boats, then what Stephen Glascock intended as a benefaction may result in incalculable injury to the city. But as this court has often ruled that a street dedicated to public use for the passage of vehicles and pedestrians may, in addition, be used for street railways, gas and electric light wires and poles, and subways, which do not interfere with or destroy its value for a public highway otherwise, in a word that such subordinate uses must have been contemplated in the original grant, why, by parity of reason, can we not say, in view of the almost absolute necessity for an easement over this public landing in order that the railroads which converge at this point may make a connection north and south, may not this landing be subjected to this subordinate use for the mere passage of trains over it, when by a carefully guarded ordinance all danger of interference with the original and prime purpose of the dedication by obstructing the passage of teams to and from the boats discharging freight and passengers is obviated by forbidding switching and blocking the landing with cars and at the same time securing for the city a landing 750 feet long and thoroughly paved and improved? Is the alleged diverting of the use, after all, anything more than a temporary passing of trains which can only occupy a short time, just as in the crossing of railways by streets and roads, and

which the city can regulate under its police power so as to avoid the danger of unnecessary delays and danger of collisions? We think that the authorities cited and a recognition of the changed conditions justify us in saying that the ordinances were not *ultra vires;* that they cannot be regarded as a destruction of the public landing for the use for which it was granted, but that they conserve, in an enlightened way, the very use for which it was dedicated, and that the enforcement of the ordinances will permit the city to have the benefit of both its railroad connections and its river traffic without destruction of either. We think, moreover, that the use of the landing is the prior and superior use, and that the railroad is the secondary use, and that without a breach of the ordinances, proper police regulations can from time to time be adopted requiring trains not to interfere with the loading and unloading of the boats or the passage of teams over and across the streets leading to the landing. We cannot regard the ordinances as creating a use which is antagonistic to the river traffic and the use of the landing, or destructive of it, but that they provide for a consistent and beneficial use to the public of both the boats and railroads. While the running of trains is accompanied by danger, wise provisions and regulations can and do reduce these dangers to a small degree, and the danger is greatly overbalanced by the benefit to the public, and the city at large. Our conclusion is that the ordinances are not *ultra vires;* that they do not provide for a diversion of the trust and use for which this landing was dedicated, but for an improved levee which the grantor contemplated when he gave it, with safeguards for the protection of those who are required to use it. It follows that the exceptions of the respondent railroad to the conclusion of law reached by the learned commissioner that the city had no power to pass these or-

dinances must be sustained, and that the writ of mandamus should, for this additional reason, be and is denied, and the alternative writ should be, and is quashed.

As to the ancillary proceeding charging a contempt of this court by respondents pending the mandamus proceedings, we have examined the evidence submitted and are of the opinion that respondents have not violated the orders of this court, and that there has been no intentional disobedience and contempt of this court by the respondents and they have fully purged themselves of any contempt, and the proceedings for contempt must be and are quashed, and respondents discharged therefrom, and that respondents are entitled to their costs in both proceedings, and it is so adjudged.

*Fox, C. J., Burgess, Valliant, Woodson* and *Graves, JJ.,* concur; *Lamm, J.,* in a separate opinion, concurs in quashing the writ of mandamus, but dissents from the views of the majority as expressed in the second paragraph of the opinion.


## DISSENTING OPINION.


LAMM, J.—I agree that *mandamus* is not the proper remedy. What we are asked to do amounts in substance, under another name, to an injunction. We have no constitutional power to issue that kind of a writ. What we cannot do in a straight line as the bee flies, we ought not to do in a roundabout way as the fox runs.

I do not agree to the second proposition in the opinion of my brother GANTT. If we had no jurisdiction to issue a writ of injunction (as this practically is) it seems to me what is said on the merits of the case is in the nature of *obiter*. Therefore, we should

State ex rel. v. Dreyer.

say nothing.   But if we say _anything_, then I do not
agree to what is said.

That Hannibal has not improved its wharf hither-
to is nothing to the purpose.   She may have been too
poor in the past to do what her growth in wealth and
population will enable her to do in the future by way
of wharf improvement.   So, her neglect of her wharf
may have arisen from a decline in river traffic, which
decline may be arrested and which traffic may assume
intense activity under changed public conditions, of
which there are many and auspicious signs.   I agree
that the city might subject the wharf to new public
easements not destructive or inconsistent with Stephen
Glascock's grant (such is the purport of the cases
cited by my brother), but that is a mere academic
question in the case as I look at it.   The vital question
here is that the municipal scheme evidenced by the
ordinances _sells_ for a price to a railroad company, en-
gaged in a line of transportation inherently an-
tagonistic to river traffic, at least at Hannibal, the
right to build such tracks at such grades as amounts
to an utter destruction to that portion of the wharf
west of the tracks and to a permanent whittling away
of the area of wharfage originally dedicated by shov-
ing the real wharf for all time east of the proposed
grade and tracks.   If the city can halve the wharf in
that way it can quarter it at some future time.   The
integrity of the wharf as a wharf is thereby destroyed.
We have no right to question the wisdom of Glascock's
grant, _i. e_, that it is too large, or so located as to ap-
parently stand in the way of the city's growth and de-
velopment, as our eyes at this moment view it.   The
eyes of the next generation may see it differently.   It
is a painful lesson in the history of American cities
that public rights to wharfs and breathing places have
been lost by yielding to-day to the hunger of commer-
cial pressure, only to be too late and ruefully regretted

in the new light of to-morrow. Our learned commissioner brought to the solution of the problem a serene and seasoned judicial judgment, I delight to honor and follow in this instance.

For these reasons I dissent from the conclusion reached in the second proposition.