# THE SUPREME COURT

OF

# OREGON.

## OCTOBER TERM, 1889.

[Filed October 21, 1889.]

## WILLIAM CHURCH, Appellant, v. THE CITY OF PORTLAND, Respondent.

In dedicating lands to the public, the dedicator may attach such reasonable restrictions to its use by the public as he may see fit, but he cannot dedicate to the public the lands of another person, for public use, without the latter's consent.

Where L. S. C. & W. W. C. were joint occupants of a tract of public land which had been settled upon under the regulations of the provisional government, and upon which they had laid off a town, which became the city of Portland, made a plat thereof, sold lots to each other, and to third persons, with covenants for further assurance' and had referred to such plats for a description of the lots sold, but which plat was unrecorded at the time; and subsequently, ascertaining that they could not enter the land under the provisions of the Donation Act of September 27, 1850, said parties made an agreement, under their hands and seals, in which they designated a part of the tract which should belong to each, and covenanted therein that each should fulfill and perform all contracts and agreements he had theretofore entered into with others, or with either of them, or of other persons, respecting the said tract of land, or any part thereof; and subsequently, and on the sixteenth day of December, 1852, the said L. caused the said plat to be recorded, with a dedicatory writing, under his hand and seal, attached, which was to the effect that any public square on the plat should be subject to the by-laws of a city corporation for ornamental purposes, and not otherwise; and one-half of the public square shown upon said plat was upon the part of the tract agreed to be set apart to the said W. W. C. ·

*Held*, in view of the said agreement, and of the facts that the parties were jointly engaged in the enterprise of laying out the town, and had a common interest in its growth and development, and the recording of the plat and dedicatory writing being in furtherance of their common design, and the plat and writing having stood upon the record for more than thirty-six years, and no dissent thereto on the part of the other parties, or of the city, appearing to have been made, that the act of L. should be considered as the act of all, and that the writing should be regarded as cogent proof of the conditions upon which the public squares were dedicated.

*Held, further*, that the building of a city hall upon such public squares, to be used for the transaction of city business, with a jail in the basement thereof, would be a use of them foreign to the purpose for which they were dedicated; and that the owners of a lot which had been purchased from the town proprietors, or either of them, and which would be affected by such appropriation, had a remedy in equity to inhibit such use.

*Held, also*, that a general dedication of the land for public squares implied that they were to be enjoyed by the public at large, and could not rightfully be appropriated by the city authorities for the use of the city in the management and conduct of its economic affairs.

APPEAL from a decree of the circuit court for the county of Multnomah, dismissing a complaint upon demurrer.

The facts sufficiently appear in the opinion of the court.

*W. T. Muir*, for Appellant.

*W. H. Adams*, for Respondent.

THAYER, C. J.—In this case the appellant filed his complaint to enjoin the respondent, a municipal corporation, from entering upon and building a city hall, with a city jail in the basement thereof, upon block 54, in the city of Portland, claiming that said block, and also block 53, adjacent thereto, were both dedicated to, and accepted by, the city as a ",public square," for the use of the inhabitants thereof, and the public generally, as an open plaza; and it was to be kept and maintained as open ground, to be planted with trees and otherwise ornamented, as a place for public gatherings and outdoor recreation.    It is alleged in the complaint that said blocks are a part of a certain tract of land which was formerly in the joint occupation of Daniel H. Lownsdale, Stephen Coffin and W. W. Chapman, who claimed to be the owners thereof, and who subsequently obtained a patent to it in severalty from the United States under the Act of congress of September 27, 1850, known as the "Donation Law."    That said Lownsdale, Coffin and Chapman, while in possession of said tract

of land as aforesaid, caused a survey thereof to be made into blocks, lots, streets, parks, and other public grounds, and caused a map or plat thereof to be made, commonly known as the "Brady Map," and sold lots and blocks by reference to that map. That the appellant is a resident of said city, and is now the owner of lot 4, in block 59, which is a part of said tract of land. That said lot is upon the opposite side of the street from said block 53, and was for a valuable consideration sold and conveyed by said Lownsdale and others to Charles Hubbard on or about the twelfth day of February, 1850, under and through whom, by regular and mesne conveyances, the appellant has become, and now is the owner thereof. That said city of Portland is situated, in large part, on said tract of land. That at a meeting of the common council of said city, held on the twenty-ninth day of April, 1852, among other business transacted, the following resolution was passed: "*Resolved,* that the city council of Portland adopt the plat of said city drawn by John Brady as the city plat; and that the mayor appoint a select committee, with instructions to call upon the proprietors of the city of Portland, and obtain from them a bond or deed of all the public streets in said city, and a deed of trust for all the land donated to benevolent societies, public schools, public squares," etc. And by an ordinance approved February 27, 1869, entitled "An ordinance adopting a map showing the plan of the streets, blocks, and public property in the city of Portland," it was recited and ordained as follows:

"Whereas, the common council of the city of Portland, at its regular meeting held April 29, 1852, adopted the map commonly known as the 'Brady Map' as the plan of streets, blocks, and public property; and whereas, since that date, several additions have been made to the city; and whereas, a complete plan of all the streets, blocks, and public property has been made by order of the common council by C. W. Burrage, and submitted at a meeting of the common council held July 18, 1866: Now, therefore, the city of Portland does ordain as follows: Section 1. That the

map of the city of Portland surveyed and drawn by order of the common council by C. W. Burrage, city surveyor, 1866, be, and is hereby, adopted as the official map of this city, showing the plan of the streets, blocks, and public property within the city limits. Sec. 2. That the auditor and clerk be, and is hereby, directed to attach to said map a certified copy of this ordinance, and cause said map and ordinance to be recorded in the records of deeds in the office of the county clerk of Multnomah county, Oregon."

That upon said Burrage map said blocks 53 and 54 were each marked and designated by the words "Public Square," and recognized by said city as having been set apart and dedicated by said Lownsdale and Chapman to the use of the public, as aforesaid; and that said city had planted trees therein, and otherwise improved the same, as and for public parks and open plazas. That all of the said improvements were made by the said city in pursuance of ordinances duly passed by its common council, and approved by its mayor, in which ordinances the said blocks 53 and 54 were referred to and designated as the "Public Square," and as the "Plaza." That neither of said blocks has ever been built upon, or made use of, otherwise than as a public park or open plaza, having said shade trees growing thereon, and as ground devoted to public use and adornment, and as a place for public meetings and for outdoor recreation on the part of such of the inhabitants of said city, and of the public generally, as might choose to resort thereto for such purposes; and that appellant, and each of his predecessors in title to said lot 4, in block 59, bought said lot, and took a conveyance thereto, upon the faith, and in the expectation and belief, that said blocks 53 and 54 were each so dedicated to, and accepted by, said city. But that, notwithstanding, the common council of the city, on the nineteenth day of April, 1889, resolved to build and erect a city hall on the west half of said block 54, and authorized and empowered the committee on ways and means to act in breaking ground thereon for the foundation of said building, and that said committee were

threatening and intending so to do, and had caused the city surveyor to make a survey thereof, and set stakes preparatory to digging up and excavating the ground for the construction and erection of such city hall; and, unless enjoined from so doing, the city will cut down the shade trees on said west half of said block 54, and will proceed immediately to erect thereon a building for a city hall. That the plans and specifications for said building, adopted by said city, provide that the basement story thereof shall be finished and completed as and for a city jail; and, if the said city hall be erected, said basement thereof will be so finished and completed, and will be used as a public jail, wherein will be confined prisoners awaiting trial for crimes against the laws of the State, as well as persons convicted of violating city ordinances.   The complaint also contains the usual allegations of damage and irreparable injury which will result in case the respondent is not restrained from doing the acts referred to. It also appears therefrom that the west half of each of said blocks 53 and 54 is situated upon that part of said tract of land patented to said W. W. Chapman, and the east half thereof upon the part patented to the said Daniel H. Lownsdale. It further appears from the complaint that on or about the twenty-first day of September, 1870, the common council of the city passed the following ordinance, to wit:

"Ordinance No. 861.   An ordinance to provide for quieting the title to certain portions of public property. Whereas, it is deemed expedient to quiet and perfect the titles to certain pieces of land heretofore dedicated to the use of the city of Portland as public parks and squares; and whereas, W. W. and M. F. Chapman have proposed to convey to the city any interest they may have, whether of dower or otherwise, in property so dedicated, especially the west half of blocks No. 53 and 54, and the blocks known on the map as 'Park Blocks,' lying between Salmon and Mill streets:  Now, therefore, the city of Portland does ordain as follows:  Section 1.   That the standing committee of the common council on streets and public prop-

erty be, and are hereby authorized and empowered to negotiate with W. W. and M. F. Chapman for a deed conveying all their interest, whether of dower or otherwise, in the west one-half of blocks number 53 and 54, and the seven blocks known as 'Park Blocks;' lying between East and West Park streets and Salmon and Mill streets, provided that the consideration therefor, including expenses connected therewith, shall not exceed $6,400."

That, pursuant to said ordinance above recited, the said purchase was made, and a deed of conveyance from the said W. W. and M. F. Chapman was executed to the city of Portland. A copy of the "Brady Map," together with an abstract of all the deeds and conveyances affecting said blocks 53 and 54, was filed with said complaint as an exhibit. The demurrer to the complaint was upon the general ground that it did not state facts sufficient to constitute a cause of suit.

No argument was, as we are informed, had upon the merits of the case before the circuit court, and its decision in sustaining the demurrer was only formal. Counsel for the respective parties have attempted to make an agreed case herein, by stipulating that the demurrer admits all the matters and things alleged in the complaint, and that the complaint is an agreed statement of undisputed facts in the case. I do not think, therefore, that the stipulation changes the *status* of the case, as an agreed case must be made up in the manner prescribed by the Code. The question before us is as to the sufficiency of the complaint to constitute a cause of suit. Said blocks 53 and 54 are indicated upon the Brady map as "public squares;" but the complaint is very ambiguous as to the time when said map was made, and the circumstances attending the affair. It appears that on the ninth day of December, 1852, a plat of D. H. Lownsdale's claim was delivered to the clerk and recorder of Washington county for record; that it included a map or plat of the original town of Portland, which map or plat is conceded to have been the "Brady Map;" that said plat of D. H. Lownsdale's claim was on the sixteenth

day of December, 1852, recorded in the office of said clerk and recorder; that a writing was attached to said plat, bearing date December 3, 1852, purporting to be under the hand and seal of the said Lownsdale; that by the terms of said writing the use and control of said blocks were expressly restricted.    It is evident, however, that said map was in existence prior to that time, as the common council of the city adopted it as the city plat on the twenty-ninth day of April, 1852.

The contention between the counsel is not, however, as to the facts that the blocks were dedicated as a "public square," but it is as to the restriction of their use and control by the city authorities.    If the owners of the land set the blocks apart to remain open grounds, subject to the control of the city authorities only for the purpose of being ornamented, as would appear from the dedicatory writing attached to the said plat, then the city has no ground whatever to claim the right to erect the proposed city hall thereon.    The owners of the land had a right to restrict the use of it by the public to any reasonable extent which they saw fit.    But the respondent's counsel insists that, as Lownsdale alone signed said dedicatory writing, the restriction contained therein, of the use and control of any public square, did not affect the west half of said blocks; that portion thereof being upon Chapman's donation land claim.    Lownsdale, of course, had no authority to limit the public use of any land belonging to Chapman; but the latter could hardly pretend that he owned, at the time, a distinct interest in the tract of land, consisting, in the main, of the town-site of the city of Portland.    The complaint and exhibits filed herein show that the claim, which was known as the "Portland Claim," was settled upon and occupied under the laws of the provisional government. That Lownsdale purchased the possessory right to it from Pettygrove in 1848, and in September of that year had it recorded in his own name in the Territorial record books. That Coffin and Chapman subsequently became interested with Lownsdale in the claim; but that the record title

thereto still remained in the latter. That the parties afterwards ascertained that they could not jointly enter the claim under the provisions of the Donation Act, and therefore made the agreement of March 10, 1852, known as the "Escrow," by the terms of which the said parties each severally covenanted, among other things, that he would fulfill and perform all contracts and agreements which he had theretofore entered into with the others, or either of them, or with other persons, respecting the said tract of land, or any part thereof. They had laid out the town and had a common interest in its growth and development. It was an enterprise which they had jointly undertaken, and in which they had a community of interest. Each of them may be presumed to have incurred obligations in the sale of lots, and in the transaction of business relative to the laying out of the town, which, according to the terms of the escrow, he was required to fulfill and perform. Under such circumstances, said parties should not be regarded as strangers to each other; but the act of one, in carrying out the common object, should be considered as the act of all, especially where there is nothing showing any dissent from it upon the part of the others. Said dedicatory writing has stood recorded in the record of the county for more than thirty-six years; it is signed by one of the town proprietors; and neither of the other two, nor the city of Portland, is shown to have ever made any objection to it. It seems to me, therefore, that the writing should be regarded as cogent proof that the parties, in making the map, intended that blocks 53 and 54 should remain open plazas; and that the city authorities should have no control over them, further than to ornament and protect them.

But counsel for the respondent contend that if said blocks were dedicated to the city "for ornamental purposes, and not otherwise," as provided in said dedicatory writing, it does not mean that they were to be kept and preserved as open plazas forever, and in no other way; that the language is too vague and uncertain to have such effect; that the ground may as well be ornamented with public buildings

as with public seats, shade trees, and walks; that the fact that, by the same writing, lots and blocks of ground were dedicated for churches and school-houses, as well as for "parks" or "plazas," but none for public buildings, unless it was intended that these "public squares" might be so appropriated and used, is strongly indicative of the intention of the dedicators that they might be "ornamented" with public buildings if the city authorities should so determine; that a grant is construed most strongly against the grantor where the intention is doubtful, and that, in reason, the same rule must apply in case of a dedication to public use; that the intent to restrict the use to a particular purpose must be plainly expressed, to deprive the proper municipal authority of the right to devote the property to such use as may appear to be most beneficial to the public. I do not think that the language, in said dedicatory writing, that the blocks were dedicated to the city for ornamental purposes, and not otherwise, is vague or uncertain. It restricts their use to the one purpose, and provides, in effect, that they shall not be used for any other. The city authorities do not propose to use the blocks for ornamental purposes, but for the direct private benefit of the city. Using land to erect a public building thereon is not using it for ornamental purposes, however grand or magnificent the structure erected may be. It devotes the land to a useful purpose; but it certainly is not using it for an ornamental one. Building a private dwelling upon a spot of ground may have the effect to ornament it very much; but nevertheless the dwelling is not erected for ornamental purposes. It is built to afford shelter, protection, and convenience to the owner or occupant. The argument which would admit of the city authorities building a city hall upon said blocks would also admit of their building thereon engine-houses, pauper-houses, pest-houses, and every kind of structure which the city authorities might determine to be ornamental. Nor do I see any force in the argument that the fact that lots and blocks of ground were dedicated in the same writing for churches and school-houses, as well as

XVIII. OR.—6.

for "parks" and "plazas," but none for public buildings, is indicative of the intention of the dedicators that the blocks dedicated for "public squares" might be ornamented with public buildings, if the city authorities should so determine. The dedication for churches and school-houses, as shown by the writing, is full and explicit. It is as follows: "C. Church appropriated to the Congregational Church; No. 23, N. ½ B. Church appropriated to the Baptist Church; No. 62 N. ½ district school block 211." There is no vagueness or uncertainty about these dedications; and, if the town proprietors had intended to dedicate said blocks 53 and 54 as a site for public buildings, they would doubtless have been equally explicit. I cannot understand how the city authorities are able to suppose that any such use of the blocks in question was intended. The city of Portland was no mendicant, nor was it expected to be. It has always been able to buy necessary and suitable grounds upon which to erect its public buildings; and it should do so, and not attempt to encroach upon its public squares, which were clearly intended to be left open and unoccupied for the health, comfort and recreation of its inhabitants. The argument of the respondent's counsel, that the dedicators intended that the blocks might be ornamented with public buildings, if the city authorities should so determine, if maintained, would be liable to lead to absurd consequences. One set of city officials might hold to one policy, and another set to a contrary one, and each act lawfully. The city authorities of to-day might determine that the blocks should be ornamented with public buildings, and proceed to erect them at a great expense; which would be entirely consistent with the intention of the dedicators. The city authorities of next year may conclude that the blocks should be ornamented only with walks, rustic seats, trees, grass, flowers, fountains, statues, and mementoes of heroic deeds, and, in order to carry out the latter mode of ornamentation, proceed to tear down the edifices erected by their predecessors; which would be equally consistent with

the intention of the dedicators.  I do not think that the
court would be justified in adopting any such view.

The rule in regard to property dedicated for public use,
as laid down in 5 Amer. & Eng. Ency. Law, 417, 418, is as
follows:  "Property dedicated to the public use may be
said to be restricted to the use for which it was fairly
intended to be dedicated; although this rule is construed
to include such uses as are consistent with, or necessary
to the principal use.  If dedicated property be put to a
use foreign to that contemplated by the intention and pur-
pose of the dedication, then not only the dedicator, but any
property owner, will have his remedy in equity to enforce
the proper use, and inhibit an improper one."  The ques-
tions to be determined herein are:  For what use were the
blocks intended to be dedicated?  And will the construc-
tion of the building which the common council of the city
propose to erect thereon be consistent with the purpose of
the dedication ?  That the blocks were intended to remain
open plazas, and be beautified and adorned by the hand of
art, I do not think there can be any doubt.  Spots of that
character, especially in large cities, are highly important.
They afford healthful and pleasant resorts in the heated
season, and are in fact the only places where a large class
of the community are able to go and enjoy the blessings
and comfort of shade and pure air; and any attempt on the
part of public officials to appropriate them as a site for
public buildings, in which to conduct the economic affairs
of a city, under any pretext whatever, would, as I view it,
be a cruel effort to subvert a humane scheme.  The build-
ing of a city hall, with a jail in the basement thereof, upon
the said block, as the common council propose to do in this
case, would, in my judgment, be a use of it foreign to the
purpose for which it was dedicated, and should not be
permitted.

Said council also claims that the city accepted the Brady
map before said dedicatory writing was attached to it, and
that the town proprietors had no right, after the accept-
ance, to attempt to restrict the use of the blocks as therein

provided. The city did not accept the map in terms. The common council, by the resolution of April 29, 1852, adopted the plat drawn by John Brady as the city plat; and the resolution provided that the mayor appoint a select committee, with instructions to call upon the proprietors of the city and obtain from them a bond or deed of all the public streets in the city, and a deed of trust for all the land donated to benevolent societies, public schools, and for public squares, etc. Whether the mayor ever appointed any such committee, or whether any such committee ever conferred with the town proprietors upon the subject, does not appear. The probabilities, however, are that the committee was appointed, and that the subsequent recording of the Brady map, with the dedicatory writing attached, was the result of such conference. But, if said writing had never been executed, I do not see that it would have made any difference. The blocks were indicated on the map as public squares; which implied, of course, that they were to be enjoyed as such by the public at large, and not be appropriated and used by the city in the management and conduct of its affairs. The use of them in the way proposed would necessarily exclude the public from the use of them, except for the transaction of city business; but that privilege can be enjoyed wherever the buildings may be located. The act of building the city hall in question would virtually be a purpresture. The city would be making that several to itself which ought to be common to many.

The complaint is very loosely drawn in many particulars, and should have been made more definite and certain, but I do not think a demurrer to it upon the grounds that it did not state facts sufficient to constitute a cause of suit should have been sustained.

The decree appealed from will therefore be reversed, and the case remanded to the circuit court, with directions to overrule the demurrer, and to enter a decree in accordance with the prayer of the complaint, unless good cause is then shown for allowing the respondent to answer in the suit.