JOHN E. HESSIN, *Appellee*, v. THE CITY OF MANHATTAN
*et al., Appellants.*

No. 16,409.

SYLLABUS BY THE COURT.

1. INJUNCTION — *Public Officers* — *Duties Involving Discretion.*
Public officers who are required by law to perform duties in-
volving the exercise of judgment and discretion can not be
controlled by injunction while in good faith performing such
duties.

2. CONTAGIOUS DISEASES — *Official Duties—Discretion—Injunc-
tion.* The mayor and councilmen of a city of the second class,
while in good faith providing means for the control and sup
pression of smallpox which exists in the city and has increased
so rapidly and to such an extent as to make an epidemic
imminent, can not be controlled in such work by injunction.

3. ——— *Same.* In a city of the second class large numbers of
students were located in clubs and rooming houses throughout
the city. The disease of smallpox appeared among such
students, and increased to such an extent that the health
officers were unable to control or diminish the contagion by the
ordinary methods of quarantine. The officers of the city de-
cided that a pesthouse was necessary to manage successfully
the threatened epidemic. A stone building belonging to the
city and formerly used for a floral hall when fairs were being
held stood in the city park, unoccupied. This building was
prepared for temporary use as a pesthouse, and twelve pa-
tients were placed therein. No other building suitable for
such purpose could be obtained in the city. A citizen whose
residence was 500 feet from this building, being afraid of
contagion, caused the district judge to enjoin such officers
from placing any more patients in the building and to re-
move those already there within ten days. *Held,* error.

Appeal from Riley district court; SAM KIMBLE,
judge. Opinion filed November 6, 1909. Reversed.

STATEMENT.

THIS is a suit to enjoin the city of Manhattan from
using one of its buildings as a pesthouse. It is a city
of the second class. The State Agricultural College is
located in that city. About 2000 students attend this

college. These students room and board at clubs and boarding houses in the city. In the early spring of 1909 the smallpox appeared among the students in some of these clubs and boarding houses. The contagion spread so rapidly that the board of health was unable to control it with any quarantine regulations or by any plans of isolation which could be adopted. An epidemic seemed imminent. In this extremity the board sought for houses throughout the city which could be temporarily used for pesthouse purposes, but none could be obtained. The city owns a public park, which has been used for several public purposes, among which was the holding of public fairs. A stone building had been erected for a floral hall, and was used for that purpose while the fairs were in operation, but when taken by the city to use as a pesthouse it was not occupied for any purpose. It could be used fairly well for the purposes of a temporary pesthouse, and was adopted by the city for that use. Twelve patients were placed therein and guards properly stationed to prevent the further spread of the disease. The disease was in that stage of development when it was most contagious. The plaintiff resided in property adjoining the park, about 500 feet from this building. Fearing contagion, he obtained from the judge of the district court a temporary order of injunction prohibiting the removal of any other patients to such building, and requiring those already there to be removed within ten days. The city appeals to this court.

*R. J. Brock, R. W. Blair, H. A. Scandrett,* and *B. W. Scandrett,* for the appellants.

*John E. Hessin,* for the appellee.

The opinion of the court was delivered by

GRAVES, J.: The city insists that its officers were charged, at the time this action was commenced, with the duty of providing means to prevent an epidemic of

smallpox; that the performance of that duty involved the exercise of official discretion, which can not be judicially controlled by injunction.

It appears that the smallpox made its first appearance among the students who were boarding and rooming in clubs and boarding houses throughout the city. The presence of the disease was concealed by the owners of the houses, to avoid being closed by quarantine regulations. This was at least an alarming situation. The health and safety of these students, and of the citizens of the whole city, demanded immediate and energetic action. The officers of the city decided that the only manner in which this condition could be successfully managed was to provide a pesthouse where all diseased persons could be taken, and there cared for and kept isolated from other people. To carry out this plan required the exercise of discretion of the most delicate and important character. The patients were necessarily taken from home while sick and kept isolated in the house used for that purpose. Mere considerations of ordinary humanity required the officers to provide a comfortable building and to furnish the best care possible under the circumstances. At the same time, the citizens generally were entitled to adequate protection from contagion. The city officers were compelled to perform these difficult duties promptly. It was impossible for want of time to select a site and erect a suitable building. The situation presented an emergency which the officers were compelled to manage without delay and in such a manner as would protect the rights of all interested parties. It was necessary to procure a house suitable for temporary use wherever obtainable. Such a building would naturally be nearer the residences of some citizens than others, and would necessarily expose some citizens to more danger from contagion than others, but this condition could not be avoided. Chapter 46a of the General Statutes of 1901 provides for the performance of these duties and imposes a penalty for

failure to comply with the requirements of the statute. The sections of that chapter that are pertinent read:

"SEC. 3. Any municipal or county board of health or health officer having knowledge of any infectious or contagious disease, or of a death from such disease, within their jurisdiction, shall immediately exercise and maintain a supervision over such case or cases during their continuance, seeing that all such cases are properly cared for and that the provisions of this act as to isolation, restriction of communication, placarding, quarantine and disinfection are duly enforced. The local board of health or health officer shall communicate without delay all information as to existing conditions to the state board of health. Said health officer will confer personally, if practicable, otherwise by letter, with the physician in attendance upon the case, as to its future management and control, and with the authorities of the place, as to their duties in the premises. Should the disease show a tendency to become epidemic, the public and private schools must be closed, and, in extreme cases, church services suspended and public assemblages of people at shows, circuses, theaters, fairs or other gatherings prohibited. In case of smallpox, a general and thorough vaccination should be recommended and insisted upon." (Gen. Stat. 1901, § 3308.)

"SEC. 4. All persons sick with smallpox, cholera, scarlet fever, diphtheria, epidemic cerebro-spinal meningitis or any contagious or infectious diseases dangerous to the public health shall be thoroughly isolated from the public and properly quarantined." (Gen. Stat. 1901, § 3309.)

"SEC. 11. Any person found guilty of violating any of the provisions of this act or failing to comply with any requirements thereof shall be, upon conviction, fined not less than twenty-five dollars nor more than one hundred dollars for each offense." (Gen. Stat. 1901, § 3316.)

The performance of such duties is generally beyond judicial control by injunction. (*Electric Co. v. Jackson County*, ante, p. 6; *National Bank v. Comm'rs of Barber Co.*, 43 Kan. 648; *National Bank v. Peck*, 43 Kan. 643; *Insurance Co. v. Wilder*, 40 Kan. 561; *Comm'rs of Harper Co. v. The State, ex rel.*, 47 Kan. 283; 20 A. & E. Encycl. of L. 1229; 22 Cyc. 889; 2 Beach, Inj., §1373.)

In section 1240 of volume 2 of the fourth edition of High on Injunctions it is said:

"A municipal corporation being a political body, clothed with certain legislative and discretionary powers, equity is ordinarily averse to interfering by injunction with the exercise of those powers at the suit of a private citizen. And no principle of equity jurisprudence is better established than that courts of equity will not sit in review of the proceedings of subordinate political or municipal tribunals, and that where matters are left to the discretion of such bodies the exercise of that discretion in good faith is conclusive, and will not, in the absence of fraud, be disturbed. And the fact that the court would have exercised the discretion in a different manner will not warrant it in departing from the rule."

In section 687 of volume I of Spelling on Injunctions and Other Extraordinary Remedies it is said:

"The general rule of non-interference with the exercise of discretionary powers legally conferred applies with exceptional force and appropriateness to municipal bodies having extensive and important trusts of a public character confided to them and being generally vested with important legislative powers. And it is a well-settled equitable doctrine that the domain of discretionary powers conferred upon municipal bodies will in no case be invaded by the courts. This rule is very strictly adhered to with respect to the legislative powers conferred by statute. So long as the municipal body does not transcend the scope of its authority to enact ordinances, or violate any of the limitations to the exercise of such power, it will not in the absence of fraud be interfered with by injunction. Nor will courts, when it is found that municipal legislative bodies have acted in good faith and within the scope of the authority conferred upon them, investigate as to the wisdom or expediency of their action, or interfere because in the light of circumstances the court would have acted differently."

In the case of *Baltimore City v. Fairfield Imp. Co.,* 87 Md. 352, it was said:

"The statute law of the state confers upon the mayor and city council plenary power to establish, both within

and beyond the city limits, hospitals and pesthouses for the isolation and treatment of contagious and infectious diseases. . . . The preservation of the public health renders such legislation highly essential, and the authority of the general assembly to enact it, in the exercise of the police power of the state, is beyond question or controversy. Within the scope of the power thus granted the whole authority of the state is included and delegated (*Harrison v. Mayor, &c.,* 1 Gill. 264) ; and, therefore, whatever the state may directly do in furtherance of these objects, the municipality, clothed with a delegated power from the state, may also lawfully perform." (Page 360.)

In the case of *Frazer v. City of Chicago,* 186 Ill. 480, the above language is quoted and approved. In the case of *Burwell v. Commissioners of Vance County,* 93 N. C. 73, the second paragraph of the syllabus reads : "An injunction will not be granted to restrain or supervise the exercise of the discretion conferred by law upon public officers in the discharge of their duties."

In this case the city and its officers were prohibited from performing an important public duty—one which by the statute they are expressly and clearly commanded to do. To the extent that the duty was performed, it seems to have been done in good faith, for the best interests of all persons concerned, and, under the circumstances shown, with commendable promptness and good judgment. The building selected belonged to the public, and was the best that could be obtained in the city. The location was as free from objection as could have been secured. The claim that the use of the park for this purpose operated to divert it to an illegal use does not seem to be well taken. The park is public property, given by a dedication which does not limit its use. It might be used for any public purpose. A pesthouse is a public purpose for which it might be properly used temporarily, in an emergency such as existed here.

Under these circumstances an injunction preventing the performance of this duty was improper and erroneous. The temporary injunction is dissolved, and the costs are taxed to the appellee.