Argued September 12; affirmed October 22, 1946

HYLAND ET AL. *v.* CITY OF EUGENE ET AL.

(173 P. (2d) 464)

568

G. F. SKIPWORTH, Judge.

*Dorilla J. Somers,* of Eugene (with Howard M. Brownell, of Eugene, on brief), for appellants.

*S. M. Calkins* and *Frank B. Reid,* both of Eugene (with Herman P. Hendershott, of Eugene, on brief), for respondents.

BELT, C. J.

This is a suit to enjoin the use of a public park to house World War II veterans and their families on the ground that such use is inconsistent with the purpose for which the land was dedicated. The Circuit Court entered a decree that: (1) "* * * the defendants may continue to occupy the West half of Sladden's Park with not to exceed one hundred trailers, temporarily during the continuance of the housing emergency." (2) "* * * the defendants be, and they are hereby enjoined from occupying Sladden's Park for such purposes beyond the continuance of the housing emergency, and in any event beyond January 1, 1948." (3) "The City Council and the County Court be, and they are hereby Ordered and Directed to remove all trailer houses from Sladden's Park as soon as the housing emergency in Lane County is over, and in no

event later than January 1, 1948.'' From this decree, plaintiffs, who are owners of property abutting on the park, have appealed.

In 1926, privately owned property was duly dedicated as "Sladden's Park" for the "use of the public forever", and such dedication was accepted by the city of Eugene and the county of Lane. The park is in the extreme northwestern part of the city. A strip 80 feet in width on the northern end of the park is beyond the corporate boundaries of the city and is in Lane county. Sladden's Park is 420 feet east and west; 305 feet north and south. It has never been developed by the city as a park and has remained substantially in the same condition as when dedicated. On the east half, there are large fir trees, but the remainder of the tract is open ground. For a period of about four years, part of the open land was plowed up for victory gardens. It was also used to some extent as a cow pasture. Neighborhood children occasionally played in it although the park was not developed for recreational purposes.

When the war with Germany and Japan ended, there was a great influx of war veterans and their families to Eugene—the seat of the University of Oregon—seeking a place in which to live and start life anew. The housing shortage was very acute and these veterans—who had served their country so well—were greatly distressed upon finding no place in which to live. It was, indeed, a most critical and deplorable situation. Servicemen were in many instances compelled to sleep on benches in the park, in automobiles, and in lobbies of hotels. Many public-spirited and patriotic citizens shared their homes with these veterans in an effort to relieve the housing shortage. One woman—and no

doubt there were others—left her house unlocked so that some of these young men would have a place to sleep. In the morning, it was not unusual for her to find some soldier sleeping on the davenport or upon the floor. The University utilized some of its ground for prefabricated houses as shelter for veterans tak-ing advantage of educational opportunities which a beneficient government afforded them. The housing shortage was most acute and undoubtedly created a condition inimical to the public welfare, as the health and moral welfare of the city was involved.

The local authorities and various civic organizations undertook to meet this public emergency. Application was made to the Federal Housing Authority for the loan of trailer houses previously used by persons en-gaged in the national defense. Under and by virtue of the Lanham Act of Congress, as amended in June 1945, 59 Stat. 260; 42 U. S. C. A. § 1571, such federal agency was authorized to use trailer houses in areas of acute housing shortage "to provide housing for dis-tressed families of servicemen and for veterans." The federal government among other things required that the city furnish the site upon which the 100 trailer houses were to be located. Many cities throughout the country were clamoring for these trailer houses. The government had only a very limited supply of houses available for such projects. Delay in the selection of a site by the city of Eugene meant without doubt that no trailer houses would be furnished by the government. Immediate action in the selection of a site was neces-sary. The housing project in which the federal govern-ment, local authorities and the Veterans of Foreign Wars were jointly engaged was to be non-profitable. A reasonable rental was authorized to be charged to

veterans to cover the cost of the installation and maintenance of the trailer houses. Any funds derived in excess thereof was to be paid to the federal government. When the emergency ended, the trailer houses were to be returned to the government.

There is substantial evidence that the local authorities made a careful and exhaustive survey of property within the city for the purpose of selecting a suitable site for this housing project. After a consideration of the numerous factors involved, among which are water, light and sewer connections—to say nothing of cost—Sladden's Park was selected.

Pursuant to the petition of the local post of the Veterans of Foreign Wars to use Sladden's Park as a "site for temporary housing for war veterans", the city of Eugene and the county of Lane entered into a written agreement with such organization purporting to lease the park to it for such purpose. Under this agreement, the Veterans of Foreign Wars was given the privilege of installing on Sladden's Park not to exceed 100 trailer units in a manner as not to "inflict any permanent injury to the area." It was further provided that:

"The term for the use and occupancy provided for herein shall commence January 1, 1946 and shall terminate on January 1, 1948, the second party, however to have the privilege to apply for an extension of the term at the expiration on January 1948, it being understood that the use of the park shall not be extended beyond that time except upon the Council being assured of the continued need of the service, and in case of a dispute as to the propriety of an extension, the Common Council shall appoint three of its members, the second party three representatives from the Veterans of Foreign Wars and these six shall appoint a member at large to investi-

gate and make appropriate recommendations to the Common Council.''

At the time of the commencement of this suit, about 60 per cent of the trailer units had been installed in Sladden's Park and were occupied by World War II veterans and their families. These houses have floor space of 96 square feet and are arranged in rows. There is a space of 10 feet between the houses. There were also four latrine and laundry houses installed, each one of which served 25 units. Light, water and sewer connections were also provided. A superintendent resided in the park to supervise the project. When such service was disconnected, the trailer could be removed without any damage to the park.

A park is a pleasure ground set apart for the recreation of the public and to promote its health and enjoyment. *Williams v. Gallatin*, 229 N. Y. 248, 128 N. E. 121, 18 A. L. R. 1238. The word ''park''; on a plat of land dedicated to the public, signifies a place open to everyone, and it carries no idea of restriction to any part of the public. *Price v. Inhabitants of Plainfield*, 40 N. J. L. 608; *Sanborn v. City of Amarillo*, 42 Tex. Civ. App. 115, 93 S. W. 473. It is the universally accepted rule of law that land dedicated by a private owner for a specific purpose must be used in conformity with the terms of the dedication and not diverted to any other purpose. *Church v. City of Portland*, 18 Or. 73, 22 P. 528, 6 L. R. A. 259, 39 Am. Jur. 816, § 21. See notes in 18 A. L. R. 1247 and 144 A. L. R. 486, wherein courts, having under consideration the uses to which park property may be devoted, have recognized this well-known principle. When such a grant has been made by a private owner, the municipality, by accepting the dedication, becomes a trustee to carry out the

terms of the grant and it has no power to sell or lease the property for purposes foreign to the dedication. Tiffany on Real Property (3rd ed.), § 1113.

■ The extent to which the use of park property may be changed is governed, to some extent, by a consideration of the manner in which the property was acquired, whether by dedication by the owner or by purchase or condemnation by the municipality. In determining whether there has been a misuser or diversion of the property, courts are more strict in cases of grant by private owners.

■ If the project involved herein were of a permanent nature, we would have no hesitancy, in the light of the above legal principles, to grant injunctive relief to these abutting owners. However, it is clearly established that this veteran housing project is only to be maintained during a public emergency resulting from an acute housing shortage. It is only a temporary use of the park and does not substantially or materially interfere with the purpose for which the park was dedicated. To constitute a misuser or diversion there must be a substantial interference with the use of the land for park purposes. Not every invasion of property rights justifies such relief in equity. *Ludgate v. Somerville,* 121 Or. 643, 256 P. 1043, 54 A. L. R. 837. There are times when property rights must yield to human rights. Injunctive relief depends upon broad principles of equity and may, in the discretion of the court, be granted or denied in accordance with the justice and equity of the case. Many of these veterans and their families were occupants of these trailer houses at the time this suit was commenced. It would be shocking to the conscience of a court of equity now to compel them by a mandatory injunction to seek

shelter elsewhere during an acute housing shortage. As stated in 28 Am. Jur. 213, § 20, a mandatory writ "is not regarded with judicial favor and is used only with caution and in cases of great necessity." The inconvenience and discomfort sustained by the plaintiff abutting owners by reason of this housing project is so slight compared to the hardship and injury which would result by the eviction of these veterans that equity should refuse injunctive relief. It is difficult to reconcile the mental attitude of persons whose aesthetic senses are shocked by these "unsightly" trailer houses, and yet make no objection to the use of the park as a cow pasture. Still, as one witness expressed it: "Peggy was a neighborhood pet and loved by all."! We apprehend that these veterans and their families—including in many instances very young babies—will be as happy to vacate these trailer homes after the emergency ends as the plaintiffs will be to have them go.

■ It is urged that there are sites available in the city of Eugene for these trailer houses and it is unnecessary to use a public park for such purpose. We believe the selection of a site is primarily a matter for the local officials, and this court, in the absence of an abuse of discretion, will not interfere. In other words, sound exercise of discretion by local officials cannot be controlled by injunction.

It is not unusual during public emergencies temporarily to use parks to relieve distress and suffering. When the great San Francisco fire and earthquake occurred, rendering thousands of people homeless, the beautiful parks of that city were utilized to the full extent for hospital facilities, and no person had the temerity to contend that there was such a misuser of the parks as to afford equitable relief.

In *City of Manhattan v. Hessin,* 81 Kan. 153, 105 P. 44, 25 L. R. A. (N. S.) 228, the right temporarily to maintain a pesthouse in a public park to guard against a threatened smallpox epidemic was sustained. The contention that such use was inconsistent with the purpose of the dedication was rejected.

In *City and County of San Francisco v. Linares,* 16 Cal. (2d) 441, 106 P. (2d) 369, the right of the city to use the sub-surface of Union Square as a garage and parking station was challenged on the ground that it was "detrimental to the original purpose for which such park was dedicated." Union Square, which was conveyed to the city in 1850, had been used exclusively as a public park ever since its acquisition. The court recognized that during construction there was an interference with the surface of the park for a period of about ten months and that approximately six and one-half per cent of the park surface would be required for permanent entrances and exits to and from the sub-surface area, but held that this interference was not of such nature as to constitute a misuser or diversion. After the construction work was completed, the surface of the park was restored to its previous condition with the exception of exits and entrances.

A great many cases have been cited, but since none of them are based upon a similar factual situation, we deem it unnecessary to extend this opinion by reviewing them. After careful research of the authorities, we have found no case very much in point.

In our opinion, the only legal force and effect of the agreement—purporting to be a lease—entered into between the city of Eugene and the county of Lane and the Veterans of Foreign Wars was to permit the use of the park for this veterans' housing project during

a housing emergency. When such emergency ends, and this question is primarily one for the local officials to decide, the trailer houses must be removed. In determining the question as to when the emergency is ended, the city and county must of course act in good faith and cannot capriciously or arbitrarily deprive the public of the use of the park.

The suit for injunction is not dismissed. The plaintiffs have the right, without prejudice, to move for issuance of the writ when the emergency has terminated. The decree of the Circuit Court is affirmed. Defendants are entitled to costs and disbursements.