The CITY OF ST. LOUIS, a Municipal
Corporation, Appellant,

v.

William S. BEDAL et al., Members of the
Board of Commissioners of Tower Grove
Park, and Howard F. Baer, et al., Members of the Board of Trustees of the Missouri Botanical Garden, Respondents.

No. 51223.

Supreme Court of Missouri,

Division No. 2.

Sept. 13, 1965.

As Modified Oct. 11, 1965.

Thos. J. Neenan, City Counselor, Aubrey B. Hamilton, Associate City Counselor, St. Louis, for appellant.

Chas. Claflin Allen, St. Louis, for Howard F. Baer, and others, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, of counsel.

John P. McCammon, St. Louis, for William S. Bedal, and others.

PRITCHARD, Commissioner.

This case for declaratory judgment was transferred to this court by the St. Louis Court of Appeals upon the ground that title to real estate was involved in the requested declaration. Const.Mo.1945, Art. V, § 3, V.A.M.S. The issue is whether there will be such diversion from park purposes by a proposed construction by plaintiff of a four-lane depressed throughway through Tower Grove Park in St. Louis as to divest title from the city of St. Louis and vest it in defendant Board of Trustees of the Missouri Botanical Garden. It is claimed by defendants that there will be such diversion from park purposes so as to work a forfeiture of the title to the park property by reason of breach of the following condition in the 1868 deed of Henry Shaw wherein he granted the property, 276.76 acres, to plaintiff:

"To have and to hold the same unto the said city of St. Louis in absolute property in fee so long as the said city shall conform and comply with the following conditions annexed to said grant, to-wit:

"First, that all of said tract of land hereby annexed except the aforesaid strip, two hundred feet in width shall be and remain and be used and managed as a public park for the health, well-being and enjoyment of the citizens of said city and county of St. Louis, forever. That no portion of said park shall ever be used for any other purposes than those appertaining properly to such public park * * *.

"It is hereby expressly provided, and this conveyance is made upon the express condition, that if said conditions upon which said conveyance is made or any of them shall be violated * * after the death of said Shaw, then the said estate hereby conveyed and all improvements thereon shall go to and be vested in whomsoever said Shaw may appoint for the use of the Missouri Botanical Garden or directly in said Garden, whenever the same is incorporated or authorized by law to hold directly in its own name and for its own use * * *."

[The strip 200 feet wide is not in issue here, it being an area provided by Shaw for the leasing and construction of villas, the income from which ultimately went for the purposes of the Missouri Botanical Garden.]

We do indeed have appellate jurisdiction of this case. The declaration sought upon the contemplated or threatened action of the plaintiff in placing its throughway through the park could have the effect of making the reversion clause in the above deed operative, or, on the other hand, to make it of no effect under the facts of this case (i. e., as claimed by plaintiff that there would be no diversion from park purposes in the construction of the throughway). Thus the judgment operates upon the title to the reversion and upon the title to the fee now vested in

plaintiff. See Cantrell v. City of Caruthersville, Mo., 267 S.W.2d 646, 648 [3–5].

Paul W. Preisler, a resident taxpayer of plaintiff city, who owns property in a block adjacent to the intersection of Tower Grove and Magnolia Avenues, was permitted to intervene as a defendant. The Oak Hill Neighborhood Association, a voluntary unincorporated association of real property owners in an area adjacent to the southern boundary of Tower Grove Park, was granted leave to appear as amicus curiae.

The trial court found for defendants, and in Paragraph 4 of its decree declared that "The diversion of approximately five acres across the middle of said park for a depressed highway would violate the condition referred to supra, and would cause a reversion of said park to the Missouri Botanical Garden." By Paragraph 5 of the decree the court further declared that "The exercise of discretionary rights, powers and duties by the defendant members of the Board of Commissioners of Tower Grove Park is limited to such rights, powers and duties as do not violate the terms of the Act of 1867 (hereinafter in this opinion mentioned) and the conveyance by Shaw to the Plaintiff City. Authorization by the Commissioners of the construction of a depressed highway across said park would be an act in excess of their powers and would cause a reversion to the Defendant Missouri Botanical Garden." (Parenthetical reference ours.) Plaintiff City appeals from the final judgment entered.

Further facts are these: In 1867, the park area proposed to be granted by Henry Shaw was located partly in the City of St. Louis and partly in St. Louis County. Shaw, in order to enable the park commissioners of the city to control the park (which was adjacent to his botanical garden), secured the passage in the state legislature of "An Act to Create, Establish and Provide for the Government of Tower Grove Park of the City of St. Louis" [Laws of Missouri, 1867, page 172]. Section 1 of the Act provided that as much

and such portions as Henry Shaw may see fit to give, grant and convey to the City of St. Louis, for the purposes of a public park, of the area bounded by Grand Avenue on the east, Arsenal Street on the south, Magnolia Avenue on the north and Kingshighway on the west, "shall be known and designated as the Tower Grove Park of St. Louis." Section 2 provided that the park should be under the exclusive control and management of a board of commissioners which was amplified in Section 5: "The said board shall have the full and exclusive power to govern, manage, direct and control the said park; to lay out and regulate the same; to pass ordinances for the regulation and government thereof, not inconsistent with the ordinances and regulations of the corporation of St. Louis; to appoint such engineers, surveyors, clerks, and other officers as may be necessary; to prescribe and define their respective duties and authority, fix the amount of their compensation, and generally, in regard to said park, they shall possess all the power and authority which now is, or which may hereafter be, by law conferred upon or possessed by the corporation of St. Louis in respect to the public squares and places in said city."

The charter authority of plaintiff over parks, being stipulated, is as follows:

"Article I, Section 1(14)—Streets, alleys, parks, sewers, etc.—To establish, open, relocate, vacate, alter, widen, extend, grade, improve, repair, construct, reconstruct, maintain, light, sprinkle and clean public highways, streets, boulevards, parkways, sidewalks, alleys, parks, public grounds and squares, wharves, bridges, viaducts, subways, tunnels, sewers and drains, and regulate the use thereof."

"Article I, Section 1(33)—General Welfare—To do all things whatsoever expedient for promoting or maintaining the comfort, education, morals, peace, government, health, welfare,

trade, commerce or manufactures of the city or its inhabitants."

Tower Grove Park extends about 7,600 feet east and west and about 1,500 feet north and south. Since its original establishment there has been in use by the public a park road from Magnolia Avenue at Tower Grove Avenue to the south across the park to Arsenal Street between Bent Avenue and Morganford Road. About 60 per cent of the park lies to the east of the park road, and about 40 per cent lies to its west. According to Plaintiff's Exhibit 43, there is a circle for traffic about the center of the park road, and there are four accesses from the east and west portions of the park onto the park road.

As far back as the year 1917 the City Plan Commission has recommended a crossing of the park as a part of the plaintiff's major street plan. The need for a crosstown trafficway has been pointed out, and according to the commission there is a geographic necessity to cross Tower Grove Park (and Fairgrounds Park to the north several miles). A further consideration of the roadway crossing proposal was made in 1930, being then approved by the City Plan Commission and by the Board of Park Commissioners of Tower Grove Park. In 1955 the residents of St. Louis approved Proposition No. 6 of a bond issue in the amount of $11,615,000, for the purpose of establishing, opening, widening, constructing and reconstructing public streets, highways, parkways and benefits and otherwise improving the same and acquiring rights of way and land therefor. The portion of Proposition No. 6 bond issue allocated for the proposed depressed throughway in Tower Grove Park was fixed at $325,000, which is said to be interdependent with the Morganford Road improvement from Arsenal Street to Gravois, which was fixed at $650,000. These matters were explained to the voters in the election in a "fact book" wherein it was stated:

"These projects will permit continuous north-south traffic movements be-

tween Tower Grove at Magnolia and Morganford at Arsenal. Plans include a depressed highway through Tower Grove Park and the widening of Morganford south of Arsenal to Gravois. This tied in with the program to widen Morganford south of Gravois which is already under way.

"Tower Grove and Morganford, which are about midway between Grand and Kingshighway, carry heavy traffic but the movement is impeded by an offset in the two streets and Tower Grove Park. Several dangerous curves in the Park would be eliminated, along with straightening of connection between Tower Grove and Morganford. This would increase safety."

The areas in and surrounding the park are in excess of 100% traffic capacity at the present time, according to the latest standards applied by plaintiff's Traffic Division. Photographs taken show the traffic congestion of the park road. The proposed Midtown throughway runs in a general north-south direction. On its north it connects with the Mark Twain expressway. As it runs southward it will successively intersect the proposed Page-Easton throughway, Forest Park Avenue, Daniel Boone expressway, proposed Interstate 44, and then will proceed on southward. As proposed, this "Midtown" throughway will be four lanes in width with a median strip, sloped embankments with adequate fencing, and it is planned that it be screened from view by appropriate landscaping improvements. Provision is made for vehicular and pedestrian crossing of the depressed roadway. The maximum depth beneath the surface near the center of the park will be approximately 18 feet. The plans are designed to preserve the existing circle driveway in the center of the existing driveway across the park.

Mr. Frank Kriz, President of plaintiff's Board of Public Service, gave his opinion that the proposed Midtown roadway, when constructed, would remove the existing traf-

fic saturation of the park drive across the park; would improve traffic safety within the park; would tie in with a needed cross-town traffic route; and that it would be designed to preserve aesthetic values and thus be harmonious with the over-all park area. Mr. Ellis Henry, Traffic Commissioner, testified that the proposed roadway would alleviate traffic congestion, and would improve safety conditions. The roadway would enable anticipated traffic from interchanges to be distributed more adequately than would otherwise be the case. There is a need for a cross-town throughway aided by an extension through Tower Grove Park, which would be of benefit to the entire city from a traffic standpoint.

Mr. Robert Jones, Director of Planning for the City Plan Commission, testified that the withholding of approval of the Tower Grove Park traffic crossing would destroy the needed and planned cross-town traffic route because of the existing jog between Morganford Road and the park entrance; that the only way to remove traffic congestion from the park drive was to construct the depressed crossing across the park; that the depressed roadway would enable the city to handle traffic that was anticipated when the interchanges for Interstate 44 and the Daniel Boone expressways were constructed. Mr. Jones gave his opinion that the proposed roadway would advance safety in the park and protect park use.

Mr. Kriz testified further that all of the necessary preliminary work (detailed engineering plans for the design and construction, etc.) of the proposed roadway was being withheld until the legal questions (herein presented) could be determined, and the widening of Morganford Road to Gravois (southward from the park) was being, for the same reason, completely held up.

Pursuant to the legislative authority of the 1867 Act, supra, the Board of Commissioners of Tower Grove Park passed numerous regulations therefor. Among these are a prohibition against entering or leaving the park except by gateway; no omnibus or express wagon, with or without passengers, nor any cart, truck or other vehicle carrying goods or passengers or solely used in carrying goods or passengers shall be allowed, nor any vehicle carrying more than six persons; the park shall be open daily to the people during the winter months from seven o'clock in the morning to one-half hour after sunset, and from six and seven in the morning until one-half hour after sunset during summer months; the comptroller or superintendent may direct that the park entrances be closed at any time; no fire engine, hook or ladder, cart, hose, truck or other machine on wheels commonly used for extinguishing fire shall be allowed in the park without the previous consent of the comptroller; and no funeral procession or hearse shall be allowed therein. The proposed throughway, which curves slightly to the west as it crosses the park, will destroy some grass tennis courts. The plaintiff has in the past expended funds on the park roads. The bond election mentioned above also provided $11,000,000 for public parks.

The first matter presented by plaintiff is that the court erred in adopting Paragraph 4 of its decree. The contention is that the construction of the proposed highway across the park would not violate the condition in the Shaw deed nor cause a reversion of the title to the park land to the Missouri Botanical Garden. It is said that the evidence shows that the proposed roadway would enhance the safe use of the park; would be incidental to park use; would tend to preserve the unity of the park by preventing its division by surface traffic; and would be a reasonable exercise of lawfully vested discretion in plaintiff and in the Board of Commissioners of Tower Grove Park under changed traffic and municipal conditions which have occurred since 1867 and 1868.

As to a diversion from park uses by the construction of streets and highways therein (as distinguished from park roads), a distinction is drawn in the cases as to the manner in which the park grounds were

acquired by the public. In the case where a park is-established by statutory authority, or where a municipality purchases land or condemns land therefor, the uses to which it may be put are much broader than where the land is dedicated by individuals for park purposes. In the former case it is said that the municipality acquires the fee simple title to the land, the use of which may be diverted to other public purposes, subject only to the ultimate control by the legislature. In the latter cases, the construction is made strictly in accordance with the terms of the grant. 39 Am.Jur. Parks, Squares, and Playgrounds, § 21, p. 816; 25 L.R.A.(N.S.), 980. "It is based upon the theory of a contract between dedicator and public which is binding upon both parties." Warren v. Mayor of Lyons City, 22 Iowa 351; Carson v. State, 240 Iowa 1178, 38 N.W.2d 168. See also Kirkwood v. City of St. Louis, Mo., 351 S.W.2d 781, 784 [1–3], and cases and authority there cited; School District of Kansas City v. Kansas City, Mo., 382 S. W.2d 688, 693 [5].

In the early and often cited case of Price v. Thompson, 48 Mo. 361, it was held, in an injunction suit by adjoining property owners to a park which was platted in the town of Brookfield by the original owner of the land, that the Board of Trustees of the town could not extend its Main Street through a four-acre park. The court said, loc. cit. 365, "Nothing, I think, can be clearer than that if a grant is made for a specific, limited and definite purpose, the subject of the grant cannot be used for another and a different purpose. The town took the premises as a trustee with the obligations attached, as well as the privileges conferred, and it was not competent for it to divert them to a use or purpose foreign to the expressed intention of the grantor." See also the case of Village of Riverside v. MacLain, 210 Ill. 308, 71 N.E. 408, 66 L.R.A. 288, 102 Am.St.Rep. 164, where it was held that a park could not be cut up by an extension of a street through its middle, because such use was inconsistent with and destructive of its use as a park. See

annotations, 18 A.L.R. 1248; 63 A.L.R. 486; 133 A.L.R. 34; 144 A.L.R. 492. Since the last A.L.R. annotation, cases which we have found supplementing those on the subject of the authority of municipalities to establish streets and highways through privately dedicated parks are: Baldwin Manor v. City of Birmingham, 341 Mich. 423, 67 N.W.2d 812 (use for highway purposes through dedicated park, with reverter clause, constituted a diversion from grantor's purpose); City of Dallas v. Etheridge, 152 Tex. 9, 253 S.W.2d 640 [affirming result in Etheridge v. City of Dallas, Tex.Civ. App., 246 S.W.2d 692] (where it was held that the use of part of the park property as a public road under the facts shown was inconsistent with the purpose to which the city was required to devote the property and was a breach of the condition of the easement); see also 26 C.J.S. Dedication § 65, p. 557; 11 McQuillin, Municipal Corporations, 3rd Ed., § 33.74, p. 831; and Dillon, Municipal Corporations, 5th Ed., § 1075 et seq.

Plaintiff cites City of Louisville v. Milton, Ky.C.A., 247 S.W.2d 975. There was in that case a proceeding in eminent domain to condemn the park land for a thoroughfare. The title to the property was acquired by the Board of Park Commissioners to be held for public park purposes, and in only one of the deeds was that purpose expressly provided. There appears to be no issue presented, as here, of a dedication by an individual to park purposes, and the court in this Kentucky case did not discuss the same. We deem neither the City of Louisville case nor the Kirkwood case to be helpful (except as to statements of the general rules) in a disposition of the case at bar where we have an express dedication by Henry Shaw to park uses with a reverter provision in the event of cessation of, or diversion from, such use. Nor do the cases of State ex rel. Roland v. Dreyer, 229 Mo. 201, 129 S.W. 904, and Odell v. Pile, Mo., 260 S.W.2d 521, aid plaintiff. In the Roland case it was held that construction of a railroad on land dedi-

cated for levee purposes did not interfere with the use intended, but facilitated the handling of freight unloaded from boats. In the Odell case it was held that a grant to the city by a county of a strip to widen streets around the courthouse would be incidental to and in furtherance of use of the entire square, and would not be a diversion or misuse of the strip from such purposes.

The evidence shows here that there would be an 18 foot depression through the park for the new throughway, taking 5 acres therefor of the park area including grass tennis courts thereon; destruction of a free access by the public from and to the east and west portions thereof through and over presently existing park roads and pedestrian ways; destruction of the authority of the Board of Commissioners of Tower Grove Park over vehicular traffic in the park including the entrances thereto; and the placing therein of a four-lane limited access road with constant traffic of all kinds. From all of the evidence we conclude that the construction of the Midtown expressway through this park would be a diversion from Henry Shaw's intended and stipulated purpose that the land be used only for a park: *"That no portion of said park shall ever be used for any other purposes than those appertaining properly to such public park * * *."* Since there would be such diversion from park uses, which is in accordance with the general rule, supra, 18 A.L.R. 1248; 63 A.L.R. 486; 144 A.L.R. 492, and other cases cited, we hold that there would be a breach of the condition in Shaw's deed and a reversion would occur to defendant Missouri Botanical Garden. Although it may be true, as contended, that the proposed roadway would enhance the safe use of the park and preserve its unity by preventing its division by surface traffic, it is still a diversion from park uses. The park was not created for surface traffic. It was created for use by the public as a park. A park has been defined as a "place for the resort of the public for recreation, air, and light." Price v. Inhabitants of City of Plainfield, 40 N.J.L. 608, 612. To those uses by the public, the Board of Park Commissioners here could, in the exercise of its powers under the 1867 Act, supra, further limit the use by the traveling public of the park road now located near the center of the park. The evidence shows here that the purpose of the proposed Midtown expressway is to alleviate traffic conditions in the area and to benefit the entire city from a traffic standpoint. It is conceded, and certainly the evidence shows, that plaintiff is confronted with an ever-increasing traffic problem. However, the alleviation of traffic problems by the construction of throughways is not a park purpose. Plaintiff's Point I is overruled.

Plaintiff, by Point II, says that the trial court erred in adopting Paragraph 5 of its decree by which it is stated that the Board of Park Commissioners would exceed its powers and cause a reversion of the park to Missouri Botanical Garden if it authorized the construction of the proposed roadway.

The argument is that the 1867 Act, supra, conferred upon the Park Commissioners all of the authority which the City of St. Louis then possessed with respect to public squares and places in the city or which thereafter the corporation might have conferred upon it by law; that prior to the dedication the statute imparted to Henry Shaw the terms upon which his donation would be accepted; and that his subsequent conveyance in legal effect was a consent to all of the provisions in the Act. Plaintiff argues further that by Charter provision [Article I, Section 1(14), supra] parks may be altered, which is squarely within the scope of the powers conferred upon the Commissioners by the 1867 Act.

The 1867 Act, however, is that the park shall be in such area as Henry Shaw may see fit to give to the city for the purposes of a public park. Significant is the fact that at the time of the enactment, the proposed park area was both within and

without the city of St. Louis, from which it may be deduced that the Board of Park Commissioners would have had no authority to control and administer the park portion located without the city, absent a legislative enactment. The 1867 statute, therefore, was an enabling act. Shaw's 1868 deed so recites. The only reasonable construction of the statutory powers conferred is that they related only to control and administration of the park and not to any power to divert that use to some other public use. In this case the Board of Commissioners of Tower Grove Park is not seeking authorization to divert the 5 acres in question to street or throughway purposes. The Board is resisting the plaintiff's threatened diversion. Plaintiff's Point II is overruled.

By Point III, plaintiff contends that by reason of the 1867 Act, supra, there was a statutory establishment of the park. It says that the Act expressly provided that the operation of the park was subject to powers that might later be conferred upon the city, including the Charter provision, Article I, Section 1(14), supra, that the city may "establish, open, relocate, vacate, alter, widen, extend, grade, improve, repair, construct, reconstruct, maintain, light, sprinkle and clean public highways, streets, boulevards, parkways, sidewalks, alleys, parks, public grounds and squares," etc. We have stated above our belief that the purpose of the 1867 Act was to give authority to the Board of Commissioners of Tower Grove Park to administer it; not to divert its uses and purposes. Plaintiff relies upon the above-cited case of Kirkwood v. City of St. Louis for its charter authority to divert park uses. It overlooks the controlling fact in the Kirkwood case that Forest Park, through which it was held the city could put a freeway, was acquired in fee by condemnation pursuant to legislative authority, and the right to control it was further authorized by express grant of authority to adopt a charter (loc. cit. 351 S.W.2d 784 [4–6]), of which Article I, Section 1(14) was legisla-

tive sanction to divert a portion of the park to some other public purpose. Plaintiff overlooks the distinguishing feature of this case: a private dedication for a specified purpose, with a reverter clause if that purpose be diverted. In the Kirkwood case, loc. cit. 351 S.W.2d 784 [1–3], this distinguishing feature is set forth: "It is generally held that if a dedication of property for public use is by a private party for a specific or defined purpose, *neither the legislature nor a municipality has any power to authorize the use of the property for any purpose other than the one designated.* 26 C.J.S. Dedication § 65; Cummings v. City of St. Louis, 90 Mo. 259, 2 S.W. 130; Price v. Thompson, 48 Mo. 361; Rayor v. City of Cheyenne, 63 Wyo. 72, 178 P.2d 115, 117; Hyland v. City of Eugene, 179 Or. 567, 173 P.2d 464." (Italics added.) The foregoing quotation disposes of plaintiff's contention. Point III is overruled.

Point IV raises the issue that changed conditions of the city and its traffic situation in the area justify an alteration of the use originally contemplated by Shaw's deed. The evidence shows no change in the use of the 276.76 acres for the ninety-six years since the grant. There appear to be no encroachments upon the park and its surrounding residential area; certainly there has been no abandonment of park purposes. The only change occurring is the rapid increase of traffic which is now permitted to cross the park road. As stated, that is a municipal problem, not a park problem. The fact that traffic in this area has increased over the years would not destroy the purpose for which this park was dedicated. See analogous cases involving restrictive covenants in the use of land cited in Barnes v. Anchor Temple Association, Mo.App., 369 S.W.2d 893, 900 [7], where changed traffic conditions were urged upon one ground as a reason for not enforcing a restriction upon the use to which the property could be put. Point IV is overruled.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.